**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

CARIBBEAN I OWNERS'            *
ASSOCIATION, INC., an Alabama  *
not for profit corporation,    *
                               *
   Plaintiff,            *
                               *
v.                             *
                               *        **CV-2007-00829**
GREAT AMERICAN INSURANCE       *
COMPANY OF NEW YORK, a New     *
York corporation, and XL       *        **ORAL ARGUMENT**
SPECIALTY INSURANCE            *        **REQUESTED**
COMPANY, a Delaware corporation, *
                               *
   Defendants.           *
                               *

**DEFENDANT GREAT AMERICAN INSURANCE COMPANY**
**OF NEW YORK'S MEMORANDUM IN SUPPORT OF**
**ITS MOTION FOR SUMMARY JUDGMENT**

      Defendant Great American Insurance Company of New York ("Great American") submits this Memorandum in support of its Motion for Summary Judgment. Pursuant to Rule 56, Federal Rules of Civil Procedure, for the reasons set forth below, Great American is entitled to summary judgment.

**I.      SUMMARY OF THE ARGUMENT**

      This case stems from property damage allegedly resulting from Hurricane Ivan. Plaintiff Caribbean I Owners Association, Inc. ("Caribbean I") sued Great American for breach of contract. Great American issued a Select Business Policy ("the Policy") to Caribbean I covering certain perils during the policy period of September 1, 2004 until September 1, 2005. Plaintiff's only claim against Great American – breach of contract – is based on Plaintiff's allegations that Great American violated the terms of the Policy in

its adjustment of Plaintiff's claim following Hurricane Ivan.  Great American is entitled to summary judgment because Plaintiff's misrepresentations in the application process entitle Great American to rescind the Policy.  Additionally, Great American is entitled to summary judgment because under the clear terms of the Policy there is no coverage for the claims made by Plaintiff in this lawsuit.

Caribbean I made misrepresentations concerning its loss history as it relates to water intrusion to Great American in the Policy application process.  These misrepresentations were material and highly relevant to the risks presented by the Caribbean I building.  Great American relied on the information misrepresented and would not have issued the Policy had Caribbean I disclosed the information requested.  Because Caribbean I made material misrepresentations to Great American in its application for insurance, Great American is entitled to rescind the Policy under clear Alabama statutory law.  Alabama Code §17-14-7 entitles insurers to rescind policies based on misrepresentations in the application process.  On this basis alone, Great American is entitled to summary judgment.

Beyond its right to rescind the Policy, Great American is entitled to summary judgment because Plaintiff's claim here is excluded under the terms and conditions of the Policy.  The Policy clearly and unambiguously sets forth the conditions under which coverage is created and where coverage is excluded.  Because the Policy is clear and unambiguous, its interpretation is a matter of law for the Court.  Here, the Policy excludes coverage for several reasons.

First, no coverage is provided for the damages claimed by Plaintiff because those damages are not the result of water, including wind driven rain that seeps or leaks

through doors, windows or other similar openings as the coverage "does not apply if the covered property; including but not limited to, roof, walls, doors, ceilings, windows or foundations, has sustained damage."  Second, even if the damages claimed by Plaintiff fall under the coverage of the wind driven rain endorsement, those damages are excluded by other provisions of the policy.  Lastly, Plaintiff's failure to comply with its duties and obligations under the Policy excludes coverage and prevents any recovery.

## II.   STATEMENT OF MATERIAL FACTS

### A.   Factual Background

The property at issue in this case is a multi-story condominium building located in Gulf Shores, Alabama.  Plaintiff Caribbean I is the owners association charged with managing the property.  Initial construction on the Caribbean I building was completed in 2000 and was occupied shortly thereafter.  The building was constructed with a synthetic stucco cladding.  There are a total of 32 condominium units in the building.  Each floor contains four units.

Immediately after initial occupancy, the building began experiencing significant problems with leaking.  As early as the beginning of 2001, Unit 101 started leaking. Thereafter, on numerous occasions, multiple units in the building leaked.  These leaks were substantial and resulted in damage that necessitated repairs to individual units.  In fact, two of the people most involved with the building (Bob King as president of Caribbean I and Bill Bender as the property manager) have testified about its extensive history of leaking and the damage caused by those leaks.

King testified in prior litigation that the building had been leaking since September of 2000.  King deposition at p. 53, attached as Exhibit 1.  He himself first noticed problems when he moved in in September of 2000, and the first notice from a

renter about problems would have been in the spring of 2001, when a renter that complained about mold and mildew in King's master bath. *Id*. at 48-51. As for Unit 101, King testified that it "got slammed every time it rained." *Id*. at 60. King believed that every time it rained the floor in Unit 101 got wet. *Id*. at 70-71. King testified that Caribbean I was leaking when closings were going on and it never stopped leaking, and that, despite attempts by the developers and general contractor to repair the building, the situation never got better, but instead got worse. *Id*. at 155-156. King testified that by August 2002, the building had been leaking for almost two years and there were rusting studs in the building. *Id*. at 197.

Bender Realty, owned by William Griffin Bender ("Bender"), became the property manager of Caribbean I in April of 2001. Bender deposition at p. 12, attached as Exhibit 2. As soon as it became property manager, Bender had to deal with moisture intrusion issues. *Id*. at 15. Moisture was entering the building on both the east and west sides. *Id*. at 16-17. During the initial time period, Unit 101 had water intrusion more often than any other unit. *Id*. at 17. However, numerous units suffered from mildew and staining on the walls as a result of water intrusion. *Id*. at 20. There are many Bender records documenting this extensive, ongoing water intrusion. For example, a September 2002 inspection found wet carpet in Units 101, 201, 301, 401, 501, 601 and 701, along with wet ceilings in many of those units. *Id*. at 31 - Exhibit 11. Additionally, during this time period, some unit owners had to replace carpeting because of moisture. *Id*. at 34.

On an annual basis, Bender would prepare for the Association a Major Maintenance Repairs Report. The report for 2004 stated the following problems were occurring well before Hurricane Ivan hit Gulf Shores:

> Mitigation of water intrusion in the building has been the overwhelming maintenance issue this year. Most of the water intrusion has occurred on the east side, but increasingly the west side has been affected as well. Mitigation efforts have included hiring a contractor to rappel off the east face and caulk around joints and windows, water extraction in units, use of dehumidifiers, air blowers, ozone machines and treatment for mildew. A construction consulting firm, Williamson & Associates, Inc. was hired to inspect and document the active source(s) of water intrusion, development of remediation recommendations, inspection and review of project drawings and specifications and develop an opinion as to the exterior envelope being constructed in accordance with project documents, governing codes and industry standards. A structural engineering company, WJE Associates, Inc. was hired to determine the adequacy of the existing cold-form steel framing system in order to develop an opinion as to the framing system's effect on cracking of the stucco and to assist in development of an overall repair recommendation. Williamson & Associates $12,118.37; WJE & Associates $5,872.35; Other $8,187.52.

Bender deposition, 73, Exhibit 39. At that point in time, water intrusion was not limited to the exterior units. Even before Ivan, during Tropical Storm Hannah and Hurricane Isadore, water came in through the sliding glass doors into the interior units. *Id*. at p. 77 This water intrusion into the building was due to defects in the various component parts of the wall system and in the interface among those components. At no time prior to Hurricane Ivan were any of these leaks or other damages caused by the defects reported to Great American.

Hurricane Ivan hit Gulf Shores on September 16, 2004. Caribbean I suffered water damage which occurred during that storm. Caribbean I claims that all of this water damage was attributable to water intruding during Ivan.[1] Despite clear Policy language to the contrary, Plaintiff contends that all of the damage resulting from the water intrusion is covered under the Great American Policy.

---

[1] The nature, extent and cause of the water damage to the Caribbean I building are all very much at issue in this lawsuit and disputed by Great American. Nonetheless, there is no dispute that the building did suffer some water damage during Ivan.

### B.   Trustmark Litigation

On August 28, 2002, more than two years prior to Hurricane Ivan, Caribbean I initiated litigation (the "Trustmark litigation") against the developer, general contractor and a number of subcontractors over various construction defects and resulting cracking and other damages from those construction defects.[2]  There, Plaintiff sought to recover money damages for defects in the Caribbean I building that caused or allowed water to intrude into interior units as well as for money damages for the damage caused by the water infiltrating through the defects.   Plaintiff asserted claims against the various defendants for negligence, wantonness and breach of warranty arising out of defects in the Caribbean I building resulting from the building's initial construction.  The crux of each of Plaintiff's claims was that defects in the installation of the component parts of the exterior wall system caused the building to leak thereby allowing water to intrude into the building.  In fact, Plaintiff's Complaint in the Trustmark litigation specifically states that Caribbean I has "suffered other consequential **damage caused by the entry of moisture into condominium building structure**."   Trustmark litigation Complaint at ¶¶ 21(c), 24(c) (emphasis added), attached as Exhibit 3.

The nature and basis of Caribbean's claims in the Trustmark litigation is further illustrated by correspondence sent on behalf of Caribbean I.  Prior to filing the lawsuit, Fred Granade, as attorney for Caribbean I, wrote to Trustmark (the general contractor on the Caribbean I initial construction project) to complain about the presence of the construction defects and the water intrusion damage caused by those defects.  A copy of Mr. Granade's letter is attached as Exhibit 4.   Mr. Granade specifically noted that

---

[2] The procedural history of the Trustmark litigation is somewhat complicated.  However, in the ultimate alignment of the parties, Caribbean I was the only plaintiff.

"[s]ince the completion of the Condo in September 2000, the structure has experienced water intrusion problems and the problems continue to persist." *Id*. Mr. Granade's letter further noted that "**Caribbean I individual units had experienced water intrusion resulting in damage to the interior units**." *Id*. The water intrusion problems experienced by the Caribbean I building dated back a number of years prior to Ivan and were substantial in nature.

During the pendency of that litigation, Caribbean I hired experts to inspect the building, including the engineering firm of Wiss Janey and the water intrusion analysis firm of Williamson & Associates. These experts reached conclusions concerning the nature and extent of the construction defects and their role in allowing water to intrude into the building, identifying a number of significant defects. Caribbean I, based at least in part on the analyses of experts, identified no less than 15 defects in the building. *See* Plaintiff's Answers to Defendant Precision Plastering, Inc.'s Second Set of Discovery in the Trustmark litigation, attached as Exhibit 5. Based in part on a structural analysis prepared by Wiss Janey Elstner & Associates ("WJE") in May of 2004 (four months before Ivan), which considered the structural integrity of the wall system after years of active water intrusion, Williamson & Associates that same month recommended that the entire exterior wall system of the building be replaced. A copy of the Williamson & Associates' and the WJE Report is attached as Exhibit 6. The defects in the exterior wall system were so severe, and the water damage from those defects already so significant, that Caribbean I's own experts recommended – prior to Hurricane Ivan – that the metal stud framing supporting the exterior walls, the entire stucco system and the interior walls on the exterior sides of the building be demolished and replaced. Based on the

recommendations of the consultants, King put together an estimate to get a general idea of the costs involved in repairing the building.  Deposition of Bob King, September 22, 2008.  That estimate projected $1,166,758.67 for that work.  *Id.* at Ex. 74.

After conducting extensive discovery Caribbean I agreed to settle its claims in the Trustmark litigation.  Great American was not involved in that settlement.  After that settlement was completed, Plaintiff proceeded with this action.

### C.  **Application Process**

Caribbean I made misrepresentations to Great American in the application process which void the Policy.  Great American insured the Caribbean I building beginning in 2001.  Each year, Caribbean I was required to submit a completed ACORD Commercial Insurance Application (the "Application").  That Application made specific inquiry into whether Caribbean I had suffered any prior losses involving the insured property.  Specifically, the Application asked Caribbean I to identify "all claims or losses (regardless of fault and whether or not insured) or occurrence that may give rise to claims for the prior five years."  A copy of the Application submitted by Caribbean I for 2001 is attached as Exhibit 7.  The initial application was completed during August of 2001, and Caribbean I responded "None" to this question, failing to disclose the ongoing water intrusion, construction defects or the presence of damage to individual units.  Each year thereafter Caribbean I continued to respond "None" to this question.

A copy of the ACORD form completed by Plaintiff for September 1, 2004 through September 1, 2005 is attached as Exhibit 8.  As noted on the Application, Caribbean I affirmatively represented that no claims, losses or occurrences that may give rise to claims had occurred within the previous five years.  At no time did Caribbean I

disclose on the Application any of the instances of water intrusion or damage, or losses it attributed to the construction defects – although that information is clearly called for – nor did it disclose the presence of the Trustmark litigation.

Beyond the Application itself, Great American, through its agent Crump Insurance Services, Inc. ("Crump"), directly and specifically requested information regarding prior losses and/or damage. Crump noted the history of no reported losses and wrote to Caribbean I and Caribbean I's agent Whitehaven insurance Group ("Whitehaven") to verify that history. Specifically Kay Stephenson of Crump wrote to Caribbean I and inquired about loss history.

> Our files indicate that this insured has had no property losses during the current policy term. If your agency becomes aware of any loss/claims on this account, please notify me prior to the effective date of this renewal, so that the company may reevaluate the terms of their quote. **Loss claims activity includes but is not limited to, losses not yet reported, losses not covered by this current policy or self-insured losses, and losses below their deductibles.**

Kay Stephenson letter dated August 1, 2002 (emphasis added), attached as Exhibit 9.

Stephenson is employed by Crump and involved in gathering information from potential insureds, analyzing and evaluating that information and assisting Great American with the issuance of insurance policies. Affidavit of Kay Stephenson at ¶ 3, attached as Exhibit 10. Stephenson was personally involved in obtaining information from Caribbean I about its loss history. *Id*. at ¶¶ 3-5. The reported absence of a loss history was critical in evaluating the risks presented by Caribbean I. *Id*. at ¶ 8. Great American based the decision, in part, to insure the property on the information provided by Caribbean I in the ACORD application and responses to Crump's letters. *Id*. at ¶ 8. Had Great American been informed of the prior losses experienced by Caribbean I or the

construction defects at issue in the Trustmark litigation, it would not have issued the Policy.  *Id*. at ¶ 9.

Kimberly Gardner ("Gardner"), the initial underwriter at Great America on these policies who retained some level of involvement with the policies each year, stated that Great American relied on the negative responses to the loss history question on the application in issuing the Policy.  Affidavit of Kimberly Gardner at ¶¶ 3-7, attached as Exhibit 11.  **Had Caribbean I or its agent Whitehaven informed Great American of the water intrusion problems or the lawsuit, the Policy would not have been issued.** *Id*. at ¶ 10.  Under the circumstances, that information should have been provided to Great American in response to the ACORD application.  *Id*. at ¶10.

### D.    The Policy

Plaintiff's claim centers on the coverage provided by the Policy.  Plaintiff claims that Great American breached its contract with the Plaintiff by refusing to pay for certain damages allegedly caused by covered events under the policy.  Contrary to Plaintiff's allegations, the events at issue in this lawsuit are <u>not</u> covered by the Policy, and are in fact clearly excluded.  Clear and unambiguous Policy language excludes the damages that Plaintiff is seeking to recover here.  As such, Great American is entitled to summary judgment.

Establishing that the damages claimed in this lawsuit are not covered requires an analysis first of what the Policy covers and does not cover.  The Policy excludes damages resulting from windstorm or hail.  Policy at Bates numbered page GAIC 00046. A copy of the Policy in its entirety is attached as Exhibit 12, with all subsequent references to the appropriate Bates numbered page.  Thus, any damage due to wind is wholesale excluded

by the clear language of the Policy.  The Policy does contain an endorsement which provides coverage for "water, including wind driven rain that seeps or leaks through doors, windows or other openings."  Policy at GAIC 00048.  That coverage is limited and "does not apply if the covered property, including but not limited to, roof, walls, doors, ceilings, windows or foundations, has sustained damage." *Id*.  Thus, water damage to the building will not be covered if the water enters the building through an access point that has been damaged.  That occurred here: the water entered the building through construction defects and a defective exterior wall system, a damaged access point.

Beyond the application of the water damage endorsement, the Policy contains additional limitations.  The coverage provided by the Policy is limited by several specific exclusions.  The Policy provides

> 2.   We will not pay for any loss or damage caused by or resulting from any of the following:
>
> \* \* \* \* \*
>
> d.  (1)  wear and tear
>
> (2)  rust, or other corrosion, decay deterioration, spoilage, hidden or latent defect or any quality in property that causes it to damage or destroy itself.
>
> \* \* \* \* \*
>
> (4)  settling, cracking, shrinking or expansion;
>
> \* \* \* \* \*
>
> f.  continuous or repeated seepage or leakage of water or the presence of condensation of humidity, moisture or vapor that occurs over a period of 14 days or more.
>
> \* \* \* \* \*
>
> m.  Neglect of an insured to use all reasonable means to have and preserve property from further damage at and after the time of loss

- 11 -

    3.    We will not pay for loss or damage caused by or resulting from any of the following 3.a. through 3.c  But if an excluded Cause of Loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

* * * * *

    c.    Faulty, inadequate or defective:

        (1)  planning, zoning, development, surveying, siting;

        (2)  design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

        (3)  materials used in repair, construction, renovation or remodeling; or

        (4)  maintenance;

        Of part or all of any property on or off the described premises.

GAIC 00025-00027.

Plaintiff's claim must be analyzed using these provisions.  The Policy is clear as to what is covered and what is excluded.  The claim presented by Plaintiff here is excluded because it falls outside the coverage afforded by the Policy.  First, no coverage is triggered here because the damages claimed by Plaintiff are not covered by the wind driven rain endorsement.  Second, even assuming that coverage is not precluded in the first instance, several express exclusions in the Policy apply here and remove coverage.

**E.    Insured's Duties Under the Policy**

The Policy places clear responsibilities on Caribbean I in the event of a loss, and Caribbean I's failure to comply with these requirements eliminates any coverage which

might otherwise exist.   The Policy provides that in the event of loss or damage to the property, Caribbean 1 must give "prompt notice" to Great American, take "all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss," and cooperate in the investigation of the claim. GAIC 00015.   Additionally, the Policy provides:

> I.        Transfer of Rights of Recovery Against Others to Us
>
> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment.   That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.

GAIC 00014.

Caribbean I has failed to comply with these requirements.   It did not provide prompt notice to Great American of any losses or damage to the property.   As noted above, the Caribbean I building leaked from the completion of initial construction and not only do the defects qualify as damage, but they resulted in damage.   Under Plaintiff's expansive reading of coverage, at least some if not all of these earlier leaks and resulting damage were covered under the Policy.   Plaintiff's president, Bob Uphaus, testified that, in his opinion, all of the water that entered the building during Hurricane Ivan was covered under the Great American policy.[3]   Mr. Uphaus testified that all water, whether it came through construction defects or doors, windows or other openings, was wind driven rain under the Policy.   Interestingly, under Mr. Uphaus's interpretation, all prior instances

---

[3] Great American disputes that Mr. Uphaus's opinion concerning insurance policy interpretation is admissible or that Mr. Uphaus qualifies as an expert.  However, his statements concerning Caribbean I's positions are nonetheless binding.

of water intrusion and damage dating back to 2001 would also be covered under the

Policy.  In his deposition Mr. Uphaus testified:

> Q.    And who has made the determination about what particular items are recoverable against Great American as opposed to Trustmark or XL Specialty or whomever else there may be out there?
>
> A.    Anything that was a result of water intrusion into the building, that caused water damage or had to be replaced as a result of repairing that water damage, are items that are claims against Great American.
>
> Q.    Who made that determination?
>
> A.    I made the determination based upon the site visits that I had made, seeing the damage that was there, the damaged material that was subsequently removed and then had to be replaced because of the plans and specifications that were created by Lee Turberville and then the work that was done by C-Sharpe.
>
> Q.    So it was you, Bob Uphaus, who made that determination?
>
> A.    After all the work that had been done, I looked at these costs and then I examined some – Lee Turberville's, a portion of Lee Turberville's deposition where he talked about certain things that had to be done as a result of other things.  And then determined based upon the work that C-Sharpe had done which items would fall into which categories.
>
> Q.    Now, Lee Turberville never said what he thought was or was not caused by water intrusion, did he?
>
> A.    No.

Uphaus October 13, 2008 Depo., p. 165, line 15 - p. 166, line 21.  Attached as Exhibit 13.

* * * * *

> Q.    And in assigning damages as, for example, the water damages, you assumed that any item damaged by water was covered as water damage under the policy; is that correct?
>
> MR. SAAD:    Object to the form

> A.     Yes.  If an item is damaged by water, that's what our policy covers, water getting in and damaging some item.  Or again, as I said earlier, if an item had to be repaired as a result of water damage.

MR. REEVES:

> Q.     Did you ever undertake to determine which items were damaged as a result of water that came through or around only doors and only windows?

> A.     No, no.  My understanding of the policy is that if water got in and damaged the item, that it's covered, that that's what the wind-driven rain is about.  I don't have to know how did it get in.  I just know that water got in and caused the item to get wet.

> Q.     So any water getting into the Caribbean I causing something to get wet and causing damage would be covered under the policy; is that your position?

> A.     Yes.  The wind-driven rain portion of the policy, that's what I understand; that if water gets in any way, shape or form, that that's what it covers.

> Q.     Do you have to have wind driving the water in?

> A.     Not per my understanding of the contract.

Uphaus October 13, 2008 Depo., p. 224, line 12 – p. 225, line 16.  Clearly, based on this testimony, Plaintiff contends that all water damage occurring during Ivan is covered under the Policy.

Aside from its duties in the application process, Plaintiff had an affirmative duty under the Policy itself to notify Great American about these prior incidents of water intrusion and resulting damage.  Plaintiff never provided that notice until after Hurricane Ivan, in clear violation of the terms of the Policy.

### III.   ARGUMENT AND AUTHORITIES

#### A.   Summary Judgment Standard

A motion for summary judgment must be granted if the pleadings and summary judgment evidence show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Puckett v. Potter*, 342 F. Supp. 2d 1056, 1061 (M.D. Ala. 2004).  The moving party bears the initial burden of explaining the basis for the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party can meet this burden by showing that the nonmoving party lacks evidence to establish some element of its case on which it bears the burden of proof.  *Id.* at 322-23.  The burden then shifts to the nonmoving party to "affirmatively set forth specific facts showing a genuine issue for trial . . ."  *Puckett*, 342 F. Supp. 2d at 1061.  Put differently, the nonmovant must "demonstrate that there is indeed a genuine issue of material fact that precludes summary judgment."  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  A mere scintilla of evidence supporting the nonmoving party's position will not suffice; there must be substantial evidence in order to survive the moving party's motion.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Matsuhita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Under Alabama law, "[i]f the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment."  *McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991); *see also Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts Bros., Inc.*, 550 F. Supp. 2d 1295, 1303 (S.D. Ala. 2008) (same).

The Alabama judiciary (federal and state) has routinely been called upon to interpret insurance policies' terms.  Under Alabama law, insurance policies are to be interpreted just like any other contract – that is, they are to be interpreted by the court as a matter of law so long as the policies' terms are unambiguous.  *See, e.g., Pennsylvania National Mutual Casualty Insurance Co.*, 550 F. Supp. 2d at 1303-04 (noting, in a case wherein the court was trying to determine whether the insured was entitled to coverage under a CGL policy, that construction of an insurance policy is a question of law for the court so long as the policy's terms are plain and unambiguous); *Upton v. Mississippi Valley Title Ins. Co.*, 469 So. 2d 548, 553-54 (Ala. 1985) ("As a general rule, whether or not a written contract is ambiguous is a question of law for the trial court.  If the contract is deemed to be unambiguous, the trial court must also determine the force and effect of its terms as a matter of law.  Further, when there is no ambiguity in the terms of an **insurance contract**, it is the duty of this Court to apply its terms and enforce the contract as written.") (internal citations omitted) (emphasis added).

Plaintiff bears the burden of proof with regard to establishing coverage under the Policy.  Under Alabama law, an insured bears the burden of establishing coverage by demonstrating that its claim falls within its insurance policy.  *Shalimar Contractors, Inc. v. American States Ins. Co.*, 975 F. Supp. 1450, 1453-54 (M.D. Ala. 1997).  An insurer, by contrast, bears the burden of proving the applicability of any policy exclusions.  Id. And, although an insurer bears the burden of proving that a policy exclusion applies, the insurer's burden does not arise unless and until the insured has established a prima facie case of coverage.  *See, e.g., Fortune Ins. Co. v. Owens*, 526 S.E.2d 463, 467 (N.C. 2000) ("Until a *prima facie* case of coverage is shown, the insurer has no burden to prove a

policy exclusion."); *General Accident Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc.*, 716 A.2d 751, 757 (R.I. 1998) (holding that the insurer bears the burden of proving the applicability of policy exclusions but only after the insured has sustained its burden and established a prima facie case of coverage); 44A *Am. Jur 2d Insurance* § 1965 (2008) (explaining that, "until a prima facie case of coverage is shown, the insurer has no burden to prove a policy exclusion").

### B. Misrepresentation In Application Voids The Policy

Plaintiff's misrepresentations during the policy application process void the Policy. Each year Great American inquired about the very type of problems Plaintiff was experiencing with the Caribbean I building (and had been experiencing with the building since the completion of initial construction). Despite having filed a lawsuit over these problems on August 28, 2002, at no time prior to Hurricane Ivan did Caribbean I ever disclose to Great American or its agent the ongoing water intrusion, the presence of the construction defects or their lawsuit. It strains credulity for Plaintiff to maintain that its problems with the building were significant enough to file a lawsuit, yet somehow did not rise to the level of significance such that they needed to be reported to Great American in response to a direct question about losses or occurrences that may give rise to claims.

The Alabama Legislature has expressly recognized the right of an insurer to rescind a policy under these circumstances. The Alabama Code specifically authorizes insurers to rescind policies where the insured makes misrepresentations:

> All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties. **Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:**

(1) Fraudulent;

**(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or**

**(3) The insurer in good faith would either not have issued the policy or contract**, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

Ala. Code § 27-14-7(a) (emphasis added).  Under Section 27-14-7(a), where the insured makes a misrepresentation in the application which was material to the insurer in issuing the Policy, the insurer may rescind the policy.  As is clear here, the information requested in the loss history form is critical to Great American's decision to issue the Policy.  The testimony of Kim Gardner and Kay Stephenson make it clear that had Plaintiff disclosed the true condition of the building, the Policy would have never been written.

The Alabama Supreme Court has held under nearly identical circumstances that a material misrepresentation in the policy application entitles the insurer to rescind the policy.  *Alfa Life Ins. Corp. v. Lewis*, 910 So. 2d 757 (Ala. 2006).  *Lewis* involved an application for a life insurance policy.  The application requested certain information from the insured about her personal medical history.  In response to questions about whether she had ever been diagnosed with certain conditions or disease, the insured responded that she had not.  *Id*. at 759.  In fact, the insured had been diagnosed with those very conditions prior to the policy application according to her medical records.  *Id*. Even in the presence of evidence indicating that the insured was not aware of the fact that she had been diagnosed with these conditions, the court noted:

> Under § 27-14-7, it is not necessary that the insured have made the misrepresentation with an intent to deceive; **even if innocently made, an incorrect statement that is material to the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy in the manner that it did provides a basis for the insurer to avoid the policy.**

*Id.* at 762 (emphasis added). The court further held that to invoke § 27-14-7, an insurer "need only establish that a misrepresentation in the application was a material contributing influence that induced the insurer to issue the policy." *Id.* Under *Lewis*, all that matters is that the statement was false, not the intent of the applicant in making that statement.

The *Lewis* holding was very recently reinforced by the Alabama Court of Civil Appeals, *American Heritage Life Ins. v. Blackmon*, 2008 WL 4757147 (Ala. Civ. App. October 31, 2008). As in *Lewis*, the application indicated negative health history when, in fact, the potential insured had experienced some of the health problems about which the insurer asked. The Court reversed a judgment in favor of the insured and instructed the trial court to enter judgment in favor of the insurer. The Court found that Ala. Code § 27-14-7 required judgment in favor of the insurer where the insured failed to provide the information requested. The same result should follow here.

The importance of truthfulness and accuracy is set forth in the Policy itself. The Policy clearly states that coverage is void in the event of a misrepresentation by the insured. Specifically, the Policy provides:

> This Coverage Part is void in any case of fraud by you as it relates to the Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

>> 1.      this Coverage Part;

      2.      the Covered Property;

      3.      your interest in the Covered Property; or

      4.      a claim under this Coverage Part.

GAIC 00013. Thus, the express language of the policy itself states that a misrepresentation by the insured concerning the covered property will void the Policy. That is exactly what happened here. Plaintiff never disclosed to Great American any of the numerous construction defects or their effect on the building. Instead, whenever directly asked about losses, Plaintiff stated affirmatively that there were none. Clearly, Caribbean I failed to provide the information requested by Great American, instead misrepresenting that no losses had occurred.

Here, the record is **undisputed** that information relating to the loss history of the Caribbean I building was material to Great American's decision to issue the policy. It is also **undisputed** that Plaintiff never disclosed the ongoing water intrusion, the construction defects or the damage or losses resulting from those defects to Great American, depriving it of the opportunity to fairly evaluate the risk presented by the Caribbean I building. Finally, it is **undisputed** that Great American would not have issued the Policy had any of this information been provided. Alabama law does not allow an insured to conceal information material to risk yet take advantage of the policy benefits. Under clear Alabama statutory and case law, Great American is entitled to rescind the Policy and is, therefore, entitled to summary judgment on Plaintiff's breach of contract claim.

**C.    Plaintiff's Claimed Loss is Excluded Under the Clear Language of the Policy**

    **1.    Plaintiff's claims do not fall under the wind driven rain endorsement**

As an initial matter, the damages claimed by Plaintiff are not covered because they were not caused by water that seeps or leaks through doors, windows or other similar openings.  Instead, they were due to water intruding through construction defects, which lead to cracks in the exterior of the building. While Alabama courts have not addressed this precise issue, at lease one court has considered facts nearly identical to these and found no coverage existed. *See Point Triumph Condo. Ass'n v. Am. Guarantee & Liab. Ins. Co.*, 2000 WL 34474454 (D. Or. Dec. 29, 2000).  In *Point Triumph*, the insured owned a condo complex near the Pacific Ocean that was exposed to violent wind and rainstorms.  *Id.* at *1.  The insured's condos suffered water infiltration damage after significant storms struck the area between 1996 and 1999.  Id.  The insured, pointing to the wind-driven rain provision in its insurance policy, sued its insurer, seeking a declaration that the insurer was liable for the costs of repairing the condos.  *Id.*  The court granted the insurer's motion for summary judgment.  *Id.*

In doing so, the court noted that the insured had begun experiencing water penetration problems at its condos in 1993.  *Id.*  Several engineers had examined the buildings and determined that defective manufactured siding and the improper installation of said siding caused the water infiltration problems.  *See id.* at *1-2, *4 (noting that "all of the reports link the damages to plaintiff's buildings to either failure of the siding or to improper construction and maintenance").[4]  The court, citing these engineering reports, held that the insured's water infiltration damages were excluded

---

[4]        As is specifically relevant here, the court also noted that the "**damages to plaintiff's buildings that are the subject of this action have been studied by a number of experts, and have been the subject of negotiations that have resulted in plaintiff's receipt of a substantial sum from the siding manufacturer based upon plaintiff's assertion that the siding was defective.**"  *Point Triumph*, 2000 WL 34474454, at *4 (emphasis added).

from coverage under the policy's faulty, inadequate, or defective construction and/or materials exclusion.  *Id*. at *5.

The court rejected the insured's argument that its losses should be covered because wind-driven rain, not faulty construction, was the efficient proximate cause of its damages.  *Id*. at *5-6.  The court reasoned:

> Plaintiff's loss here was caused by moisture penetrating the siding and substructure of several of plaintiff's buildings.  Wind-driven rain, a peril covered by the policy, is a common phenomenon on the Oregon Coast, and there is no evidence in the record that it would have damaged plaintiff's buildings in the absence of defects in material or inadequacies in construction or maintenance that are specifically excluded under the policy.  **The damage to plaintiff's buildings was not a "natural" direct or indirect consequence of the rain, but instead was an abnormal occurrence that would not occur in the absence of other conditions – the faulty material, construction, or maintenance established by the record – that were specifically excluded from coverage under the policy.  Under these circumstances . . . use of defective siding, or improper construction or maintenance here "set in motion" the chain of events leading to the loss.**

*Id*. at *6 (concluding, for all of these reasons, that wind-driven rain could not "be characterized as the 'dominant' or 'most important' cause of loss") (emphasis added).  For these same reasons, Great American is entitled to summary judgment.

Clearly there were numerous construction defects present in the building since the completion of its initial construction.  These construction defects caused damage to the exterior wall system.  Water entered the building and caused damage to the interior through this damaged wall system.   The water including wind driven rain endorsement does not apply "if the covered property, including but not limited to, roof, **walls**, doors, ceilings, windows or foundations, **has sustained damage**." Policy at p. GAIC00048 (emphasis a dded).   Under the clear language of the endorsement itself, there is no

coverage for the claim made by plaintiff. Accordingly, Great American is entitled to summary judgment.

> **2.      Plaintiff's claims are excluded because they are the result of fall under the express exclusions in the policy.**

As noted above, the Policy clearly excludes losses or damages resulting from certain causes. First, and most directly applicable here, no coverage exists for any damage resulting from "hidden or latent defect or any quality of the property that causes it to damage or destroy itself." GAIC 00025. The construction defects present in the building from the date of its initial completion and the subject of the Trustmark litigation allowed water to intrude and cause damage to the building. The damage at issue in this case is attributable to these construction defects which have caused the building (property) to damage itself. This Policy language is clear and unambiguous. Under any fair reading, it excludes the very type of damage claimed here.

The Policy also excludes a loss caused by "continuous or repeated seepage or leakage of water" occurring over a period of 14 days or more. GAIC 00026. It would be difficult to imagine a more clear application of that exclusion than the one presented in this case. Here, Plaintiff experienced continued and repeated seepage of water through well recognized defects for a period of nearly four years prior to Hurricane Ivan. The damage caused by the seepage and leakage occurred on numerous occasions far surpassing the required 14 days; therefore, the claims are excluded. *Johnson Press of Am., Inc. v. Northern Ins. Co. of N.Y.*, 791 N.E.2d 1291 (Ill. App. Ct. 2003).

The insured in *Johnson Press* filed a claim for damages with its insurer after the roof of its insured warehouse collapsed. 791 N.E.2d at 1294. The insurer's investigation revealed that "the roofing of the collapsed building had been blowing off the building for

several years prior to its collapse" and that "the building suffered severe wood decay caused by water infiltration. The water infiltration resulted from the fact that a portion of the roof was missing. Since part of the roof was missing, it allowed water to enter the first- and second-floor stairwells to cause the wood decay." *Id*. at 1295. Accordingly, the insurer's experts "concluded that the deterioration [of the building] was due to water infiltrations that ultimately led to the collapse of the roof." Id. at 1296. Based on these investigations, the insurer denied the insured's claim, reasoning that the causes of the roof's collapse fell under the policy's exclusion clauses.[5] *Id*. at 1295. Following a hearing in the insured's coverage-based lawsuit, the trial court granted the insurer's motion for summary judgment, finding that because "the roof's collapse was caused by long-term deterioration and water infiltration[,]" it was not covered by the insured's policy. *Id.* at 1293, 1297.

On appeal, the appellate court affirmed, reasoning that the insured's loss "resulted from a peril expressly excluded from the policy." *Id.* at 1299. Specifically, the court noted that:

> Under the exclusion clauses of the policy, the insurer would not cover the collapse of the building if the collapse was due to . . . continuous or repeated seepage or leakage of water that occurred over a period of 14 days. . . . **[The] evidence pointed to the lack of maintenance of the building over a period of time, and the water seepage caused the wood to rot, which led to the collapse of the roof. The fungal growth on the wood indicated water had been leaking into the building for an extended period of time.** Plaintiff's expert . . . testified that fungal growth would take several seasons to develop on the wood. **This indicated that plaintiff had allowed water infiltration to occur for more than 14 days as specified under 2(f) of the exclusion clause.**

*Id.* (emphasis added).

---

[5]     Among other things, the insured's policy excluded loss or damage caused by "[c]ontinuous or repeated seepage or leakage of water that occurs over a period of 14 days." 791 N.E.2d at 1294-95.

The same result should follow here. Even if plaintiff's contentions about the scope of damages are accepted (which Great American denies), it is undisputed that the Caribbean I building had experienced water infiltration for more than 14 days prior to Hurricane Ivan. Because of the more than 14 days of prior water infiltration, no coverage exists under the Policy, and Great American is entitled to summary judgment on that basis alone.

### 3. Plaintiff's claims are excluded under the Policy because the damage from Hurricane Ivan was expected.

Additionally, there is no coverage for plaintiff's claim here because the damage to the building was not unexpected. *Factory Mut. Ins. Co., as Successor in Interest to Arkwright Mut. Ins. Co. v. Estate of James Campbell*, 81 Fed. App'x 918 (9th Cir. 2003). In *Factory Mutual*, an insurer brought an action seeking a declaration that mold damage to its insured's building was not covered. It was undisputed that: (1) the insured was aware in the mid-1980s that water leaks could be expected throughout its property because of construction defects; (2) the insured suffered yearly bouts of water damage attributable to rain water leaking into the property from the time the insured purchased the policy until the time the insurance policy went into effect in 1995; and (3) rain water damage continued to arise episodically during the period the policy was in effect. *Id.* at 919. Hazardous mold began growing in the property following heavy El Niño rains in 1997 and 1998. *Id.* The issue was whether the El Niño rains or the construction defects were the proximate cause of the hazardous mold. *Id.* The trial court, determining that construction defects were the proximate cause of the mold, entered summary judgment in favor of the insurer. *Id.*

On appeal, the Ninth Circuit affirmed.  Id. at 920.  Specifically, the court held that because the insured "was aware of substantial water damage from construction defects at the [property] well before [the insurer's] insurance policy went into effect[,]" the insurer was "not responsible for any potential claim relating to the previously discovered and manifested loss from construction defects under California's loss-in-progress rule."  Id. (internal quote omitted).  In so holding, the court noted that:

> [I]t [wa]s undisputed that rain water leaking through construction defects caused the growth of hazardous mold.  As the [insured's] construction defects were the proximate cause of the pre-1995 water intrusion damage and the water intrusion damage that caused the hazardous mold growth, the hazardous mold growth represented a 'loss-in-progress' at the time [the insured's] policy covering the [insured] went into effect.

Id.  Other courts considering this issue have reached the same result.  See, e.g., Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 775 (10th Cir. 1989) ("[A]n all-risk policy does not cover losses which were not fortuitous."); Sentinel Mgmt. Co. v. New Hampshire Ins. Co., 563 N.W.2d 296, 299 (Minn. Ct. App. 1997) ("Generally, an 'all-risk' insurance policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an 'all-risk' policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.") (internal quotes and citations omitted).

Like the known-loss and loss-in-progress doctrines, the fortuity doctrine "holds that insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur.  As applied, the fortuity doctrine prevents insurers from having to pay for losses arising from undisclosed events that existed prior to coverage, as well as events caused by the manifestation during the policy

period of inherent defects in the insured property that existed prior to coverage." *40 Gardenville, LLC v. Travelers Prop. Cas. of Am.*, 387 F. Supp. 2d 205, 211 (W.D.N.Y. 2005) (internal quotes and citations omitted).[6]  As a general rule, a "loss caused by a pre-existing defect is fortuitous so long as neither party knew of the defect or expected the loss." *Adams-Arapahoe Joint School District No. 28-J*, 891 F.2d at 775; *Johnson Press of Am., Inc. v. Northern Ins. Co. of New York*, 791 N.E.2d 1291, 1298-99 (Ill. App. Ct. 2003) (noting that loss must result from a fortuitous event in order for coverage to exist and holding that coverage did not exist for roof collapse because the "dilapidated condition of the building demonstrate[d] that the collapse of the building did not happen by chance or accident"; rather, "[i]t was expected").[7]  Clearly, given the fact that it had filed a lawsuit, Plaintiff was aware of the fact that further damage would be incurred in a rain event, particularly a hurricane.  As such, there is no coverage here.

### D.     Plaintiff Failed to Comply with Policy Provisions after Loss

On October 9, 2007, Caribbean I provided Great American with a sworn statement in proof of loss.  Under the Policy, payment of a sworn proof of loss requires

---

[6]       As one court has explained, the "policy rationale for the fortuity doctrine is simple.  When parties enter into an insurance contract, they are, in effect, making a wager as to the likelihood that a specified loss will occur.  If the loss has already occurred, or the insured knows that the loss is certain to occur for reasons not disclosed to the insurer, then the insurance contract is not a fair bet."  40 Gardenville, LLC, 387 F. Supp. 2d at 211.

[7]       Although courts are clear that an insured's loss must be fortuitous – that is, "unplanned and unintentional" – before the insured "can recover under an all risks insurance policy[,]" courts have been equally clear that coverage cannot be avoided merely by arguing that the insured should have known that a loss would take place in the future.  *See, e.g., PECO Energy Co. v. Boden*, 64 F.3d 852, 858 (3d Cir. 1995) (rejecting the insurers' argument that the insured's "failure to discover . . . thefts . . . was a violation of [the insured's] obligation under the insurance policy to avert or minimize loss" because the insurers did "not present any law which suggest[ed] that risks about which a party should have known are not fortuitous"); *Sentinel Management Co.*, 563 N.W.2d at 300 (holding that although "the eventual [asbestos] contamination of [the insured's] buildings was inevitable, due to the presence of asbestos-containing materials. . . . [the insured's] asbestos contamination constitute[d] a fortuitous loss because" asbestos contamination "was a risk inherent in owning twenty-year old apartment buildings, but it was not a certainty").

that Caribbean I must have complied with all of the terms of this Coverage Part. GAIC 00016. On November 6, 2007, Great American requested Caribbean I's full and complete compliance with the Great American policy loss conditions, including providing an Examination Under Oath and copies of documents material to the claim. A copy of the letter from Great American to Plaintiff's counsel is attached as Exhibit 14. Great American scheduled the Examination Under Oath of Caribbean I's representative with the most knowledge regarding the claim to begin on January 8, 2008, and requested that the documents be produced by December 6, 2008, in order to review them in advance of the examination.

Instead of cooperating with Great American and providing documentation and an examination under oath that would have enabled Great American to proceed to analyze this claim in a non-adversarial claim adjustment, Caribbean I filed this lawsuit on or about November 29, 2007. That suit was initiated prior to Caribbean I complying with all applicable loss conditions, and without producing **any** documentation in response to Great American's counsel's November 6, 2007 letter.

Under Alabama law, and insured's submission to an Examination Under Oath and production of documents requested is a strict condition precedent to an Insured's liability under the contract. *See State Farm Fire & Cas. Co. v. Richardson,* 2008 WL 4531765 (S.D. Ala. October 9, 2008) (holding that because the insured failed to satisfy the conditions precedent of appearing for an examination under oath and providing records requested, the insurance company did not violate the policy by not paying the claim); *Nationwide v. Nielsen*, 745 So. 2d 264 (Ala. 1998) (insured's submission to deposition after lawsuit is filed does not excuse Insured's failure to submit to an Examination Under

Oath prior to the lawsuit); *Apcan v. Farmers Ins. Exchange Inc.*, 961 So. 2d 865 (Ala. Civ. App. 2007) (affirming trial court's holding that Insured's failure to submit to Examination Under Oath entitled Insurer to deny a claim).  Moreover, once an Insured declines the Insurer's demand for an Examination Under Oath, the Insurer has no obligation to repeat its request for an examination.  *See Purvis v. State Farm Fire & Casualty Co.*, 901 F.2d 944, 948 (11th Cir. 1990) (finding insured's failure to submit to an Examination Under Oath constituted breach of an insurance contract).  As such, Caribbean I breached the terms of the policy, and that results in a forfeiture of coverage.

Plaintiff also violated the terms of the Policy by failing to preserve any of Great American's rights as part of the settlement in the Trustmark litigation.  Under the Policy, Caribbean I was required to "do everything necessary to secure [Great American's] rights and must do nothing after loss to impair them."  Instead of adhering to this requirement, Plaintiff released all rights against all parties in the Trustmark litigation.  It is undisputed that water entered the building during Hurricane Ivan by way of the leaks attributable to construction defects.  Plaintiff's release of all parties in the Trustmark litigation has impaired Great American's right to potential subrogation claims.  Plaintiff has violated the terms of the Policy.

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, Great American is entitled to summary judgment as to the claim asserted by Plaintiff.

*/s/ Frederick G. Helmsing, Jr.*
ARCHIBALD T. REEVES, IV  (REEVA2720)
FREDERICK G. HELMSING, JR.  (HELMF3421)
Attorneys for Defendant,
Great American Insurance Company of New York

OF COUNSEL:

MCDOWELL KNIGHT ROEDDER
   & SLEDGE, L.L.C.
Suite 900, Riverview Plaza
63 South Royal (36602)
Post Office Box 350
Mobile, AL  36601
Phone:  (251) 432-5300
Fax:  (251) 432-5303

## **CERTIFICATE OF SERVICE**

     I hereby certify that on this the 21st day of November, 2008, I served the foregoing on all parties of record by placing same in the United States mail, properly addressed and postage prepaid, as follows, and/or via the Court's electronic filing system.

E. J. Saad, Esq.
CROSBY SAAD LLC
6604 Hillcrest Park Court
Mobile, AL  36695

*/s/ Frederick G. Helmsing, Jr.*