*IN THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF ALABAMA*
*SOUTHERN DIVISION*

| | | |
|---|---|---|
| **CARIBBEAN I OWNERS'** | ) | |
| **ASSOCIATION, INC., an Alabama** | ) | |
| **not- for-profit corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. : 07-0829-WS-B** |
| | ) | |
| **GREAT AMERICAN INSURANCE** | ) | |
| **COMPANY OF NEW YORK, a New** | ) | |
| **York corporation, and XL** | ) | |
| **SPECIALTY INSURANCE** | ) | |
| **COMPANY, a Delaware corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>PLAINTIFF'S EXPERT DISCLOSURES</u>

Plaintiff, CARIBBEAN I CONDOMINIUM OWNERS' ASSOCIATION, INC. (the "Association") gives notice that it may call the following as an expert witness at trial:

1. <u>Aaron "Bill" Williams, PhD.</u> Dr. Williams is a principal of the Coastal Weather Research Center. Dr. Williams' Curriculum Vitae is attached as Exhibit 1 and sets out his qualifications, education, professional work history and professional publications. Dr. Williams' prior deposition and trial testimony history is as shown on Exhibits 2 and 3. Dr. Williams is expected to testify as an expert in the fields of meteorology and climatology. He is expected to testify concerning tropical storm and hurricane weather events affecting Gulf Shores, Alabama, including Hurricane Ivan. His report is attached as Exhibit 4. Dr. Williams is expected to testify consistent with his Report based on his education, experience and the findings set out therein. He is

expected to explain the procedures and methodology employed.  Dr. Williams will explain that the methodology he employed in reaching his conclusions was reliable to determine the nature of the weather conditions to which the building was exposed in Hurricane Ivan.  He is also expected to set out the facts as contained in his Report, which he will opine form a sufficient set of facts and data to support his opinions.  Dr. Williams applied principles and methods generally accepted in his profession as reliable to the facts of this case.  Attached as Exhibit 4 is Dr. Williams' Report which contains the scope of his study, procedures, methodology, facts and data considered, findings and opinions.  He may also rely upon and employ certain weather radar photographs, diagrams and other charts, which are provided with his Report.  Exhibit 5 is Dr. Williams' rate schedule.

2.   Robert E. Luke, AIA, NCARB.  Mr. Luke is a principal in the architect firm of LPK Architects, P.A.  Mr. Luke's Curriculum Vitae is included in Exhibit 6 and sets out his qualifications, education, professional work history and professional organizations.    Mr. Luke's prior deposition and trial testimony history is also included in Exhibit 6.  His charges for professional services are included in Exhibit 6. Mr. Luke has more than 20 years experience in the construction and architectural industries.  Mr. Luke is an expert in architecture, construction management and construction remediation projects, and will testify in conformity with his expertise. Mr. Luke is an expert concerning the standard of care, methods and practices of architects, owner/developers, general contractors and the evaluation of structures for repair requirements due to damage caused by various causalities, including weather events such as hurricanes.  Mr. Luke is expected to testify that he reviewed the

documents identified in his deposition of September 18, 2006 at pages 10 through 14. Mr. Luke also is expected to testify that he viewed and considered the Williamson & Associates reports; that he inspected the building and units within the property and that he observed the roof of the building and its exterior. Mr. Luke is expected to testify that he also reviewed and considered the Southern Standard Building Code and manufacturer's information as set out in his deposition. Many of Mr. Luke's observations and comments are contained in his deposition of September 18, 2006, which has been provided to all parties. In summary, the Association expects that Mr. Luke will testify that:

A. The condominium units suffered direct physical loss or damage caused by water that entered through and/or around the windows, doors and/or wall systems by infiltration, seepage or leakage. The water acted on the property in an unbroken sequence such that the final loss occurred at a time subsequent to the date of Hurricane Ivan but was nevertheless proximately the result of the entry of said water. This subsequent loss combined with the damage initially done on the date of hurricane. The loss was proximately related to water damage to the interior of the building and included loss of the cabinets, loss of sheetrock walls, and damage to flooring, continuing for months after the initial exposure to water intrusion.

B. Repair of the damage caused by water necessitated the tear out and replacement of parts of the building.

C. Many of the appliances within the condominium units, including refrigerators, cooking ranges, dishwashers, clothes washers and dryers, which were owned by the Association, suffered damage that necessitated replacement.

3

D.  The window and sliding glass door assemblies met the building code and/or ordinances that regulated construction of the building at the time of design and construction.  Repair work necessary to comply with applicable building codes and/or ordinances included the replacement of these window and sliding glass door assemblies.

E.  Due to the direct physical loss and damage as described herein, debris removal was necessary and reasonable.

F.  The Association acted reasonably in the amount and types of remedial work done to the interior of the condominium.

G.  The exterior veneer of the building was stucco, which, like concrete itself, is porous and will allow water to migrate from the outside to the inside of the wall system.  Also like all concrete, stucco will form cracks as it cures.  This is a natural process and is not necessarily indicative of a defect in the stucco.  Mr. Luke observed the stucco eastern and western facing wall systems of the building and observed such cracking.  The cracks observed were not of sufficient size to constitute an opening and would not be considered damage to the building.

H.  Mr. Luke has criticized the installation of the moisture barrier comprising part of the exterior wall system.  It is his opinion that a workable moisture barrier is necessary to prevent the water that will normally seep through the stucco from infiltrating, seeping or leaking further into the wall system and thereby entering the building.  The water that infiltrated, seeped or leaked through the stucco during Hurricane Ivan entered the building through the moisture barrier that comprised part of the wall system.  Much of this water escaped the wall system

through the interior of the building.  This escape was not intentional and was accidental.  The water caused direct physical loss or damage without damage first being sustained by said walls or the wall system.  Although moisture had previously entered the building at a number of locations for a period of time prior to Hurricane Ivan, the damage caused by this pervious moisture was comparatively minor.

I.   The Association acted reasonably to repair the damages under the catastrophic circumstances caused by Hurricane Ivan.

J.   Mr. Luke may rely on the photographs provided with these disclosures as set out herein and his on-site observations of the property.

K.   Mr. Luke may rely on documents, facts and information provided by other experts.

L.   Mr. Luke may also testify about the opinions held by other experts and reserves the right to modify and supplement his opinions and observations.

3.   <u>Vincent H. Smith</u>, Senior Associate, Williamson & Associates, current C.V. attached as Exhibit 7.  Mr. Smith is an expert who conducted the examination of building with respect to moisture and water penetration and the measures to be taken to limit and/or remediate such moisture and/or water penetration.   Mr. Smith is involved with the review, evaluation and inspection of various building components with particular expertise in long-term watertight performance of the building envelope, including field testing, identification of related issues and development of necessary repairs, remediation and corrective measures.  Mr. Smith's expertise extends to methods of waterproofing, roofing and building restoration technology.  He is skilled and learned

5

in the conducting of standard testing of buildings and building materials.  He has more than 20 plus years of experience in specialization in weatherproofing and building restoration technology.  He is an expert in these fields and will testify in conformity with his expertise.  He is an expert in problem solving in construction and design deficiencies of numerous building components which combine to make-up the exterior envelope of the facility.  In summary, the Association expects that Mr. Smith will testify that:

A.  The Association expects that Mr. Smith will testify in accordance with the documented inspections, conclusions, opinions and recommendations set forth in the report of Williamson & Associates, Inc. dated May 18, 2004, which has been previously produced, and the report of Williamson & Associates, Inc. dated August 15, 2006, a copy of which is attached hereto as Exhibits 10 and 11.

B.  The expected opinions of Mr. Smith are based upon education, training, qualifications, professional experience, review of the project documents, drawings and specifications, and personal inspections of the Caribbean I Condominiums. The authorities relied upon by Mr. Smith include, but are not limited to those identified in the reports of Williamson & Associates, Inc. and Wiss, Janney, Elstner Associates, Inc., (Exhibit 14).

C.  Mr. Smith conducted observations and tests on the window assemblies, sliding glass door assemblies and the stucco wall system.  His tests were performed by methods that are grounded in science and generally accepted in his field of expertise and used by industry for the evaluation of such assemblies and systems. His data is presented in his reports.

D. Mr. Smith visited the building in May 2004 and after Hurricane Ivan.  He observed the general condition of the window and sliding glass door assemblies. During his visits before and after Hurricane Ivan, Mr. Smith found no blown out or displaced window or sliding glass door assemblies in the condominium units. The assemblies appeared to be undamaged except for normal usage.

E. There were two types of single-hung windows installed in condominium units. One type was an aluminum framed, single-hung window manufactured by PGT Industries.  The PGT window assembly was installed on the north, east and west elevations of the building.  It is an operable window, which means it can be opened and closed.  The second type of single-hung window installed in the building was manufactured by McPhillips Manufacturing and there were only one or two of these windows installed on the lower floors.   There were approximately 16 single-hung window assemblies.

F. Fixed window assemblies were manufactured McPhillips Manufacturing.  Most of the -01 and -04 series condominium units had three of these windows per condominium unit for a total of approximately 48 window assemblies.

G. PGT also supplied the sliding glass door assemblies in each of the 32 condominium units.

H. Each of the fixed and single-hung window assemblies and sliding glass door assemblies met the building code requirements at the time of the design and construction of the building.  The building was issued a certificate of occupancy by the City of Gulf Shores.

I. During Mr. Smith's visit to the building on May 18, 2004, he inspected and tested

the single-hung window assembly in Unit 101. This assembly was of substantially the same design and construction as the other PGT single-hung window assemblies. On testing the assembly at 5 psf and 7.5 psf, the assembly exhibited water infiltration into the interior of the unit. Mr. Smith also tested a representative fixed window assembly which exhibited minor water infiltration.

J.  During a second visit on May 22 and 25, 2006, Mr. Smith conducted testing of various representative assemblies as follows: single-hung window assemblies in Unit 304 (PGT), Unit 404 (PGT), Unit 201 (PGT) and Unit 301 (PGT). fixed window assemblies in Unit 401, Unit 201 and Unit 304 and sliding glass door assemblies in Units 501, Unit 402, Unit 302 and Unit 403. The purpose of these tests was to determine the abilities of the doors and window assemblies to prevent water infiltration through the assemblies. The single-hung window assemblies were tested at 6.13 psf, which is the equivalent of wind driven rain at 48 or 49 mph. When so tested, the single-hung window assemblies allowed water to pass through the horizontal meeting rail of the assembly.

K. The fixed window assemblies were also tested at 6.13 and 8.00 psf. A test conducted with water and at a pressure of 8.00 psf is the approximate equal of wind driven rain at 56 mph. Two of the fixed windows allowed water to pass at 6.13 psf and all tested assemblies allowed water to pass at 8.00 psf.

L. All of the sliding glass door assemblies allowed water to enter when tested at 6.13 psf or the equal of 48-49 mph wind driven rain.

M. Mr. Smith is of the opinion that significant amounts of water infiltrated into the building through window and door assemblies which were otherwise undamaged.

N. The -01 and -04 units bordered on exterior stucco wall assemblies. Stucco is a form of concrete and is porous. Stucco is not considered to be "water-tight". When stucco is properly installed, normal cracking from curing may occur and is not considered a defect in material or workmanship. As such, stucco wall assemblies usually employ a moisture management or moisture control system when installed over sheathing. This usually includes a moisture barrier to prevent migration of moisture from the exterior through the stucco and into the interior of the building. The building in this case was constructed with such a moisture barrier. Mr. Smith is of the opinion that the moisture barrier was incorrectly installed and was not wholly successful in preventing moisture and water to intrude into the building. The construction of the moisture barrier does not constitute "damage" to the building. The moisture barrier did not cause the property to damage or destroy itself.

O. The moisture barrier constituted faulty, inadequate or defective workmanship, construction or design, which resulted in water, including wind driven rain, seeping, leaking or otherwise intruding into the building through undamaged structure.

P. The east and west stucco wall assemblies were the source of significant amounts of water intrusion through otherwise undamaged surfaces.

Q. Mr. Smith may amend or supplement his opinions.

4. <u>Bobby H. King</u>. Mr. King is expected to testify as an owner, an officer of the Association and as an expert witness in the fields of claims adjusting, damage recognition, repair valuation, and application of insurance policies to property loss

and damage claims.  Mr. King's Curriculum Vitae is attached as Exhibit 16.  Mr. King's only deposition testimony in the past five years has been furnished to all parties as part of the discovery in this matter.  Mr. King's fee rate is also set out on Exhibit 16.  Mr. King is expected to base his testimony on his familiarity and personal knowledge of the involved real property both before and after Hurricane Ivan.  He lived at the property before the storm on an intermittent basis.  Mr. King made personal inspections of the property in September 2004 and on other occasions following the storm.  He subsequently prepared a detailed estimate of work needed for the building.  The work described in Mr. King's estimate related to flood damage, wind damage, wind driven rain damage and other reasons for which repair work was needed in his opinion.  Mr. King is expected to delineate the areas of the building damaged by various causes and/or a combination of causes as well as other reasons for work to be performed.  His opinions are based on his education, training and experience in construction work, insurance claims adjusting, damage identification and his personal observations of the building as well as information provided to him by other consultants including Mr. Luke, Mr. Smith and Mr. Sharpe.  In summary, the Association expects that Mr. King will testify that:

A.  The Great American policy was in effect at all times material to this matter.

B.  Water entered the building during the wind driven rains of September 16, 2004. In all units of the building, the water entered through window assemblies and sliding glass door assemblies that were not otherwise damaged.  Water also entered through the stucco wall assemblies which were not otherwise damaged.

C.  The direct physical loss and/or damage began on September 16, 2004.  Because of

covered damage to the electrical and HVAC systems of the building, the interior of the building could not be conditioned until the repairs were made months after the September 16 event.  The building sustained direct physical loss or damage as the natural consequence of the covered water intrusion into the building as described herein into December 2004.

D.  The water that intruded into the building directly caused physical loss or damage for which the Association is making its claim under the Great American insurance policy.

E.  The building sustained covered direct physical damage due to water that is covered under the Great American policy.  The building also sustained direct physical damages for which there is no coverage under the Great American policy.  The building's damage in its entirety resulted in enforcement of the ordinances that regulated the demolition, construction and/or repair or the building.  As a result of the application of said ordinance requirements, certain demolition and repair work had to be performed on the building.

F.  The water caused direct physical loss or damage to the units' ceiling finishes, wall finishes, drywall, insulation, all trim, and door units, including hardware.  All units required refinishing and repainting of drywall and other painted surfaces.

G.  Electrical and plumbing items were damaged and/or had to be removed to facilitate repairs of other damage to the units.  This included electrical wiring, fixtures, bath fans, smoke detectors, emergency lighting and outlets.  Some cable wiring also required replacement

H.  In all units, flooring both in the form of carpeting and tile had to be removed and

replaced as a result of the covered water damage.

I.   For the exterior units, -01 and -04, all finished cabinets, counter tops and appliances had to be replaced as a result of covered water damage.

J.   Due to the direct physical loss and/or damage caused by water, substantial demolition had to be accomplished to remove damaged materials as part of the repairs.

K.   The total covered loss for which the Association makes claims against Great American is $2,408,422.38 subject to the $50,000.00 deductable.   The details of this loss calculation are as shown on Exhibit 19.

L.   The lost or damaged property has actually been repaired and/or replaced.   The amounts claimed are based on replacement cost and do not include deduction for depreciation.

M.  The above amount may be supplemented to provide the cost of demolition and clearing other than that done of the exterior walls and cladding.

N.   Mr. King reserves the right to supplement and amend his findings.

5.   <u>E. W. McKean, Jr.</u>   Mr. McKean is a Certified Public Accountant and is Stockholder and Managing Principal of CPA Associates, P.C.   Mr. McKean's Curriculum Vitae which sets out his qualifications, education, and professional work history is attached as Exhibit 20.   Mr. McKean's rate is $350 per hour of service.   He is expected to testify as an expert in accounting for the purpose of presenting damage summary information compiled by others.   Mr. McKean is expected to rely on monetary information provided to him by other witnesses, as well as other information used to designate the various damages according to their respective causes.   His opinions will

be presented in chart and oral form and will be provided by supplementation.

6.      All exhibits and attachments are available for inspection and copying at the offices of

Crosby Saad, LLC.

                                         s/ E. J. Saad_____
                                         E. J. Saad (SAADE8614)
                                         Attorney for Plaintiffs


                                         s/ Jason Gerth_____
                                         JASON GERTH (GERTJ7870)
                                         Attorney for Plaintiffs

OF COUNSEL:
CROSBY SAAD LLC
6404 Hillcrest Park Court
Mobile, Alabama  36695
Phone:    251-476-3000
FAX -     251-776-5750
ejsaad@crosbysaad.com
jgerth@crosbysaad.com

## CERTIFICATE OF SERVICE

        I do hereby certify that on this 12th day of August, 2008, I have served a copy of the
foregoing upon all counsel of record listed below via United States Mail, properly addressed,
first class postage prepaid. or via electronic filing:

Archibald T. Reeves, IV, Esq.
McDOWELL, KNIGHT, ROEDDER & SLEDGE, LLC
63 South Royal Street, Suite 900
Mobile, AL  36602
(251) 432-5300
(251) 432-5303 (Fax)
E-mail: areeves@mcdowellknight.com
Attorneys for Great American
Insurance Company of New York

Ray Thompson, Esq.
158 Congress Street
Mobile, Alabama  36603
(251) 432-005
E-mail:  scapitch@bellsouth.net
Attorney for XL Specialty Insurance
Company

Matthew L. Litsky, Esq.

Michael Germain, Esq.
PHELPS DUNBAR, LLP
100 South Ashley Drive, Suite 190-00
Tampa, Florida  33602-5311
E-mail:  litskym@phelps.com
germainm@phelps.com
Attorneys for XL Specialty Company

                                                  s/ E. J. Saad_____
                                                  Of Counsel

## PLAINTIFFS' EXHIBITS TO DISCOLOSURE

1.      Curriculum Vitae of Aaron "Bill" Williams, PhD.

2.      Court Testimony of Dr. Aaron "Bill" Williams, 1998 to Present.

3.      Deposition Testimony of Dr. Aaron "Bill" Williams, 2001 to Present.

4.      Dr. Aaron Williams, <u>Report: Tropical Storms and Hurricanes: 2000-2006</u> and attachment thereto.

5.      Dr. Aaron Williams Rate List.

6.      Robert E. Luke, AIA, NCARB: Curriculum Vitae, Resume, Rate Sheet, Prior Testimony.

7.      Photograph of Caribbean I dated 09-28-2004

8.      Estimate of PASI by Jeremy Gildenmeister dated February 17, 2005 for XL Specialty Insurance Company.

9.      Vincent H. Smith: Curriculum Vitae

10.     Vincent H. Smith Rate Sheet

11.     Vincent H. Smith Prior Testimony

12.     <u>Report of  Williamson & Associates, Inc. dated May 18, 2004</u> and attachment.

13.     <u>Report of Williamson & Associates, Inc. dated August 15, 2006</u> and attachment.

14.     <u>Report of  Wiss, Janney, Elstner Associates, Inc.</u> and attachment thereto.

15.      Video tape of Caribbean Condominium dated April 26, 2005.

16.      Video tape of Caribbean Condominium dated June 11, 2005.

17.     Bobby H. King's Curriculum Vitae.

18.     B. H. King repair and work estimate of February 2005.

19.     Bobby H. King damage exhibits.

20.     Resume of E. W. McKean, Jr.

21.     C-Sharpe Photographs