**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CARIBBEAN I OWNERS'<br>ASSOCIATION, INC.,** | )<br>)<br>) |
| **Plaintiff,** | )<br>) |
| **v.** | )    **CIVIL ACTION 07-0829-KD-B**<br>) |
| **GREAT AMERICAN INSURANCE<br>COMPANY OF NEW YORK,** | )<br>)<br>) |
| **Defendant.** | )<br>) |

**ORDER**

This action comes before the court on Defendant Great American Insurance Company of New York's Motion for Summary Judgment (doc. 115). The Motion has been extensively briefed and is ripe for disposition.[1]

**I.    Nature of the Action.**

This case is an insurance dispute arising from damage to a condominium development in Gulf Shores, Alabama, in connection with the landfall of Hurricane Ivan in September 2004. In its First Amended Complaint (doc. 52), plaintiff, Caribbean I Owners' Association, Inc. ("Caribbean I"), alleged that defendant, Great American Insurance Company of New York ("Great American"), issued an insurance policy (the "Policy") providing coverage to Caribbean I's real property for the period of September 1, 2004 through September 1, 2005. Caribbean I maintains that it suffered losses covered under the Policy when Hurricane Ivan struck the Alabama coast, damaging its real property, but that Great American refused to abide by the terms of the Policy and pay benefits despite timely notice and claim by Caribbean I. On that basis, Caribbean I brings a single state-law cause of action against Great American for breach of

---

[1]    Defendant has requested oral argument on the Motion. Pursuant to Local Rule 7.3, the Court in its discretion may rule on any motion without oral argument. After careful consideration of the parties' voluminous submissions, the undersigned is of the opinion that oral argument would not be of substantial assistance in resolving the issues presented. Accordingly, the request for oral argument is **denied**.

contract, on the theory that "[t]he failure of Great American to properly adjust the loss and pay benefits for the loss caused by Hurricane Ivan as required by the Great American Policy constituted a breach of contract for which Plaintiff seeks damages."  (Doc. 52, ¶ 19.)[2]

II.     **Background Facts.**[3]

      *A.*     ***The Building and Pre-Ivan Water Intrusion Issues.***

The Caribbean I condominium project (the "Building") is a nine-story concrete structure located at 1057 West Beach Boulevard in Gulf Shores, Alabama.  (Defendant's Exh. 6, at 5.)  It includes 32 residential units, with four units per floor on the second through the ninth floors.  (*Id.* at 6.)  The Building received a Certificate of Occupancy in August or September 2000.  (*Id.* at 5; Bender Dep., at 15.)

Undisputed record evidence confirms that the Building had a history of water intrusion problems predating Hurricane Ivan.  William Bender ("Bender") and Bender Realty became property managers for the Building effective in April 2001, and faced water intrusion issues immediately.  (Bender Dep., at 15.)  Bender explained that "[f]rom time to time when it rained, if it was raining in a particular direction, for instance, there would be water that would get into Unit 101 primarily."  (*Id.*)  Bender also identified two other units (Units 201 and 404) that would sometimes experience water intrusion when it rained, and indicated that "there probably was some degree of water intrusion into some of the east and west units ..., but the one that received the most water was Unit 101."  (*Id.* at 15-16.)  According to Bender, this problem was intermittent and water did not always enter the Building after every rain event.  (*Id.* at 16.)  A September 2002 inspection of the Building disclosed wet carpet and wet spots in various units.  (*Id.* at 31.)  A document prepared by Bender for the period of January 2004 through October

---

[2]      Federal subject matter jurisdiction over this purely state-law matter is conferred by 28 U.S.C. § 1332, given that Caribbean I and Great American are citizens of different states and the amount in controversy, as pleaded in the Amended Complaint, is well in excess of $75,000, exclusive of interest and costs.

[3]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in its favor.

2004 stated as follows: "Mitigation of water intrusion into the building has been the overwhelming maintenance issue this year. Most of the water intrusion has occurred on the east side, but increasingly the west side has been affected as well." (*Id.* at 73 & Exh. 39.)[4]

It is likewise undisputed that Caribbean I initiated legal action well before Hurricane Ivan in an attempt to address the Building's water intrusion problems. In August 2002, Caribbean I sued the developer, general contractor and various subcontractors in the Circuit Court of Baldwin County, Alabama (the "*Trustmark* Litigation"). (*See* Defendant's Exh. 3.) In that action, Caribbean I alleged a host of construction defects that culminated in "consequential damage caused by the entry of moisture into condominium building structure." (*Id.*, ¶ 21©.) Caribbean I's then-attorneys wrote in May 2002 that "[s]ince the completion of the Condo in September 2000, the structure has experienced water intrusion problems and ... individual units have experienced water intrusion resulting in damage to the interior of the units." (Defendant's Exh. 4.) A team of construction consultants retained by Caribbean I concluded in May 2004 that the water intrusion issues at the Building were "the main result of poor design and installation of the exterior stucco wall assemblies," with other contributing construction defects. (Defendant's Exh. 6, at 1.) To remedy these defects, the consultants recommended an array of repairs, including replacement of all exterior stucco walls. (*Id.* at 2.)[5] Those repairs did not happen before Hurricane Ivan.

### B.   The Policy Application and Renewal Processes.

---

[4]    Caribbean I's architecture expert, Robert Luke, characterizes this ongoing water intrusion issue as a "very minor" occurrence that "did not cause the damages that are the subject of this lawsuit." (Luke Aff., at 5.) The view is echoed by Bender, who testified that water intrusion at the Building prior to September 16, 2004 never caused the kind and extent of damage observed after Hurricane Ivan. (Bender Dep., at 199-200.) Before the Hurricane, all units in the Building were rentable, but afterwards, none of them were. (*Id.*)

[5]    Caribbean I's stance, articulated by Luke, is that the *Trustmark* Litigation was predicated on the failure of the developer and contractors to meet a promised higher standard of materials and workmanship than the applicable building code, not on any failure to meet threshold standards of that building code in the first place. (Luke Aff., at 5.) Luke maintains that the Building did meet minimum requirements of the applicable building code as to both materials and workmanship, even at the time of the *Trustmark* Litigation. (*Id.*)

Of critical significance to the pending Rule 56 motion is the process through which Caribbean I obtained and renewed insurance coverage from Great American, and particularly the representations or omissions made by Caribbean I or its agents during that process.

On or about July 2, 2001, Caribbean I prepared or caused to be prepared an ACORD Commercial Insurance Application form.[6]  The two-page "Applicant Information Section" of that form, which was signed by Bob King (the president of Caribbean I at that time), included a section labeled "Loss History" and instructed the applicant to "[e]nter all claims or losses (regardless of fault and whether or not insured) or occurrences that may give rise to claims for the prior 5 years."  (Defendant's Exh. 7, at 2.)  Caribbean I's form checked the box bearing the legend "Chk here if none."  (*Id.*)  A similar form was submitted on August 2, 2004, in connection with the annual policy renewal.  At that time, Caribbean I once again checked, or caused to be checked, the box labeled "Chk here if none" in the "Loss History" section. (Defendant's Exh. 8.)  It is thus undisputed that Caribbean I did not place Great American on notice of its history of water intrusion problems, or the *Trustmark* Litigation relating to same, in either its July 2001 or its August 2004 application forms.

Plaintiff and its agents maintain that those application forms were answered truthfully because they did not view the water intrusion problems and *Trustmark* Litigation as "claims or losses" which must be reported to Great American antecedent to policy issuance or renewal. Bob King, who signed the initial July 2001 application on Caribbean I's behalf, testified that there were no losses or occurrences that would give rise to a claim in the five years preceding his execution of the form.  (King Dep., at 380-81.)  King felt that the same was true as of the 2004 renewal application, inasmuch as he "was not aware of any losses filed for that period of time." (*Id.* at 381-82.)  Bruce White, who was Caribbean I's insurance agent during the relevant time period, testified that, in his view, the loss history question would not encompass matters such as

---

[6]     The application form (and the forms that Caribbean I used to renew the Policy in later years, including 2004) recited language above the signature block in all capital letters as follows: "Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and ... civil penalties."  (Plaintiff's Exhs. 8-11.)

leaks that had been repaired by the Building's maintenance department, warranty issues between the Building owner and its contractors, or lawsuits between owners and contractors. (White Dep., at 58-60.)   White also noted that neither Great American nor its agent (Crump) had ever defined the term "loss" for purposes of that ACORD application form. (*Id.* at 60-61.)   White deemed Caribbean I's answers in the "Loss History" section of the application to be truthful and accurate. (*Id.* at 74-77.)

The record reflects that Great American or its agents solicited information from Caribbean I or its agents about the Building's loss history on other occasions.   For example, in an August 2002 quotation confirmation to Caribbean I's agent (Bruce Q. White & Associates, later known as Whitehaven Insurance Group) about the Building, Great American's agent (Crump Insurance Services of Atlanta) wrote that its files indicated no property losses for Caribbean I in the current policy term, and requested notification of any loss/claims prior to the effective date of renewal so that Great American could reevaluate its quotation.   This request specifically stated, "Loss claims activity includes but is not limited to, losses not yet reported, losses not covered by the current policy or self-insured losses, and losses below their deductibles." (Defendant's Exh. 9.)   Crump sent similar letters and information requests to Caribbean I's agent each year during the policy renewal process. (Stephenson Aff., ¶ 6.) Neither Caribbean I nor its agent provided information to Great American or its agent about the water intrusion or *Trustmark* Litigation issues in response to these inquiries.

Representatives of both Crump and Great American have submitted affidavits reflecting that Caribbean I's omission of this information concerning the Building's ongoing water intrusion problems was material to policy issuance and renewal decisions.   Kay Stephenson, a representative of Crump who was involved in quoting, binding and issuing Great American's policies for Caribbean I, avers that "[t]he issuance and renewal of each policy was based upon the negative answers to the loss questions in those applications and the failure of [Caribbean I] and [its agent] to tell us otherwise." (Stephenson Aff., ¶ 7.)   According to Stephenson, "[p]rior loss history is critical to evaluation and underwriting the risk. ... Had I known the extent of the water intrusion problems and the lawsuit related to these problems prior to the issuance of any of these policies, I believe that they would not have been issued by Great American.   That information, which was never disclosed to Crump at all, ... was material to the risk involved, and

a positive answer, which these circumstances clearly required, would have affected the underwriting process." (*Id.*, ¶ 9.) Stephenson's testimony is echoed in a similar affidavit executed by Kimberley Gardner, who was an underwriter or supervisor for Great American as to the policies issued to Caribbean I during the relevant time frame. (Gardner Aff., ¶ 3.) Gardner explains that Great American relied on information collected by Crump in quoting and issuing policies, that Great American was not aware of any loss history at the Building prior to binding coverage on September 1, 2004, that loss history is critical to Great American's risk evaluation and underwriting processes, and that in issuing the Policy, Great American relied on Caribbean I and its agent's report of no loss history. (*Id.*, ¶¶ 7-9.) According to Gardner, had Caribbean I disclosed a loss on its application documents, "that binding and ultimate issuance of the policy as quoted would not have occurred." (*Id.*, ¶ 9.) Gardner concludes that the Policy would not have been issued had she been aware of the extent of the water intrusion problems and litigation relating to same, that this omitted information was material to the risk involved, and that disclosure of such information by Caribbean I "would have affected the underwriting analysis." (*Id.*, ¶ 10.)

### C.    *Relevant Policy Terms.*

The Policy issued by Great American to Caribbean I for the September 1, 2004 through September 1, 2005 term insured the Building from certain covered perils, but specifically excluded others.[7] For example, the Policy included a "Windstorm and Hail Exclusion" providing that Great American would not pay for loss or damage "caused directly or indirectly by windstorm or hail, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage." (Defendant's Exh. 12, at GAIC 00046.) Notwithstanding this exclusion, a "Select Business Policy General Endorsement" in the Policy extended coverage to Caribbean I for "water, including wind driven rain that seeps or leaks through doors, windows or other openings," provided that such coverage "does not apply if the covered property; including but not limited to, roof, walls, doors, ceilings, windows or foundations, has sustained

---

[7]    It is undisputed that Caribbean I paid the required policy premium to Great American for the September 2004 policy renewal, and that Great American has at no time tendered that payment back to Caribbean I in connection with any efforts to rescind the Policy. (Gardner Dep., at 13; Hurley Dep., at 29.)

damage." (*Id.* at GAIC 00048.)  The wind-driven rain endorsement, which is central to Caribbean I's coverage claims, provided coverage up to a limit of $1 million, and was subject to a $50,000 deductible.  (*Id.*)

The Policy also set forth various exclusions, several of which Great American has invoked in these proceedings.  Among the relevant terms are exclusions for loss or damages caused by or resulting from "hidden or latent defect or any quality in property that causes it to damage or destroy itself"; "settling, cracking, shrinking or expansion"; "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more"; and "[n]eglect of an Insured to use all reasonable means to have and preserve property from further damage at and after the time of loss." (*Id.* at GAIC 00025-26.)  Another exclusion in the Policy bars coverage for loss caused by or resulting from faulty, inadequate or defective design, workmanship, construction, materials, or maintenance; provided, however, that coverage for a loss from that cause would be provided by Great American if and to the extent that it "results in a Covered Cause of Loss." (*Id.* at GAIC 00026.)[8]

Application of these coverage and exclusion provisions of the Policy to the record facts is a key component of defendant's Motion for Summary Judgment.

### D. *Hurricane Ivan.*

The devastation wrought by Hurricane Ivan to the Alabama Gulf Coast on September 15 and 16, 2004 is a matter of public record, and is well known to the undersigned and everyone else who lived in this region at that time.  Nonetheless, to quantify and address with precision the

---

[8]      A further potentially relevant section of the Policy is the transfer-of-rights provision, which states in pertinent part as follows: "If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment.  That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them." (*Id.* at GAIC 00014.)  Great American contends that this Policy provision was triggered by the history of water intrusion at the Building preceding Hurricane Ivan, and that Caribbean I was obligated by that provision to notify Great American about past incidents of water intrusion and the resulting property damage. (Doc. 116, at 15.)  Great American further argues that this provision was violated when Caribbean I executed releases in favor of the *Trustmark* Litigation defendants upon settlement of that case.

impacts of the storm, Caribbean I has retained Dr. Aaron Bill Williams of the Coastal Weather
Research Center at the University of South Alabama as an expert concerning weather events,
including Hurricane Ivan.  Dr. Williams indicates that sustained winds at the Building reached as
high as 96 to 109 miles per hour during the storm, with wind gusts at that location in excess of
130 mph.  (Plaintiff's Exh. 51.)

Robert Luke, an architect retained by Caribbean I, opines that Hurricane Ivan subjected
the Building to high winds and driving rain for an extended period of time, resulting in damage
caused by seepage or leakage of water into the Building through and around windows, doors and
sliding glass doors.  (Luke Aff., at 2.)  Luke maintains that the Building's residential units (none
of which were on the ground floor) sustained neither wind nor flood damage.  (*Id.*)  In Luke's
opinion, the cracking of the Building's stucco that pre-existed Hurricane Ivan was "not a
material factor in the entry of water into the Building's interior space"; instead, such water
intrusion was the product of wind-driven rain entering through and around windows, doors and
sliding glass doors.  (*Id.*)  According to Luke, "[t]he wind driven rain caused by Hurricane Ivan
would have and did cause the damage to the Building regardless of the presence of any cracking
or other known construction defect."  (*Id.*)  Luke categorizes and itemizes Caribbean I's loss
based on damage to the Building caused by Hurricane Ivan's wind-driven rain as follows: (a)
repair and replacement of interior portions of Building that suffered direct physical loss as a
result of wind-driven rain (including removal and replacement of water-damaged sheetrock)
totaling $1,055,031; (b) debris removal totaling $81,215; © demolition and replacement of
undamaged portions of Building as required by the applicable building code (including removal
and replacement of sliding glass doors, windows, elements of electrical and plumbing systems,
exterior framing, sheathing, cladding and stucco), totaling $1,233,562; (d) demolition of
undamaged exterior framing, cladding and sheathing to comply with the building code, totaling
$412,009; and (e) use of specialized lifts and other equipment in the rebuilding and remodeling
efforts, at a cost of $191,971.  (*Id.*, at 2-4.)  In the aggregate, Caribbean I claimed $2,918,756 (to
be reduced by the $50,000 deductible) from Great American under various Policy coverages as a
result of Hurricane Ivan, at least as of December 15, 2008 when Luke executed his affidavit.  (*Id.*

at 4.)[9]

An adjuster named James DuPre examined the Building on behalf of Great American on October 4, 2004, less than 20 days after Hurricane Ivan.  (Plaintiff's Exh. 30.)  DuPre determined that "at least 20 units have some damage from wind-driven rain where water has seeped in and around the windows, beachside sliding glass doors, or the front doors which are exposed to the exterior elements and weather on the front of the building."  (*Id.* at 3.)  With respect to the Building's 32 condominium units, DuPre did not find any doors or windows that were blown in, broken, or damaged by wind or flying objects.  (DuPre Dep., at 30.)  DuPre also did not find any damage to the exterior walls and roof of the Building through which water may have entered. (*Id.* at 182-87.)  DuPre's observations were that the insured "had been doing as much mitigation at that time as they possibly could" to prevent exacerbation of the wind-driven rain damage by removing wet carpet and the like to minimize mold.  (*Id.* at 189.)

Great American concedes that "there is no dispute that the building did suffer some water damage during Ivan."  (Defendant's Brief, at 5 n.1.)[10]  Nonetheless, Great American disputes the sources of, and coverages available for, that water damage.  According to Great American, "water intruded to the interior of the building over an extended period of time through cracks in the exterior cladding," such that most of the areas for which the insured claimed Policy benefits had previously been damaged.  (Plaintiff's Exh. 12, at 2.)  As Great American put it, "Our

---

[9]      The parties' summary judgment filings focus on the wind-driven rain coverage, which was capped at $1 million.  Under plaintiff's theory, though, the existence of a covered loss caused by wind-driven rain would trigger the other, ancillary coverages sought, such as those for debris removal and "ordinance or law coverage."  Great American has not argued on summary judgment that if the wind-driven rain coverage applies and the water damage is not excluded, then these other ancillary coverages (debris removal, loss to undamaged portions of the Building, demolition, increased costs of construction) would not properly come into play.

[10]      This admission is consistent with Great American's statement to Caribbean I in correspondence dated May 18, 2005 that the Building "was damaged by flood, wind, resulting water leakage from wind damage and wind-driven rain associated with Hurricane Ivan." (Plaintiff's Exh. 12, at 2.)  It is further reinforced by Great American's statement in its Answer to the First Amended Complaint in this lawsuit that "Great American admits that it examined the subject property after Hurricane Ivan and determined that wind-driven rain, a covered peril under the Policy, caused damage to the subject property."  (Doc. 54, ¶ 16.)

investigation has determined that the building had sustained damage to the exterior cladding and that Hurricane Ivan exasperated the damages." (*Id.* at 3.)  Defendant's position at that time was that much of the water damage was attributable to cracked and damaged walls and was therefore excluded under the wind-driven rain endorsement, which excludes coverage for water entry through damaged walls.  Great American found that the only covered item of loss was wind-driven rain damage resulting from water entering units around the sliding glass doors in the rear of the Building.  The estimate to repair this loss totaled $37,382, which was below the $50,000 Policy deductible for wind-driven rain coverage.  (*Id.* at 4.)  On that basis, Great American denied any obligation to pay benefits to Caribbean I for losses sustained in Hurricane Ivan.

Caribbean I promptly made a claim under the Policy to Great American on September 18, 2004, with Great American receiving such claim from Crump on September 21, 2004, just five days after the Hurricane.  (Plaintiff's Exh. 52; Hurley Dep., at 93.)  On October 9, 2007, Caribbean I submitted proof of loss to Great American, claiming total covered losses attributable to Hurricane Ivan in the amount of $1,079,123.  (Plaintiff's Exh. 22.)  In a response dated November 6, 2007, Great American requested extensive documentation in support of the request.  Also on November 6, 2007, Great American invoked the examination under oath provision of the Policy.[11]  In particular, Great American requested that Caribbean I's most knowledgeable representative appear at a court reporter's office in Spanish Fort, Alabama for examination under oath beginning on January 8, 2008.  (*Id.*)  The examination never took place.[12]

As things stand today, Great American has denied Caribbean I's claim under the Policy in its entirety, and has made no payments to Caribbean I in satisfaction of any obligations it may

---

[11]     That provision provides, in part, as follows: "We may examine any Insured under oath while not in the presence of any other Insured and at such times as may be reasonably required, about any matter relating to this insurance or claim, including an Insured's books and records."  (Defendant's Exh. 12, at GAIC 00015.)

[12]Caribbean I filed the Complaint on November 28, 2007.  As initially formulated, plaintiff's claims were confined to the issue of appraisal and only later metamorphosed into the damage claims currently pending.  It appears that Caribbean I's resort to litigation to force appraisal prompted Great American, on its own accord, to cancel the examination under oath and deny coverage.

have under the Policy.  Great American has found that only approximately $37,000 in claimed damages were covered under the Policy.  Because the covered loss fell below the applicable $50,000 deductible for wind-driven rain, Great American reasons, no benefits were due. Caribbean I disagrees with Great American's coverage determinations, and is pursuing a breach of contract cause of action in this lawsuit to compel Great American to pay much larger sums for covered damages to the Building occasioned by Hurricane Ivan.

## III.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV.   Analysis.

### A.   *Whether Great American is Entitled to Rescind the Policy.*

As an initial matter, Great American maintains that it is entitled to entry of judgment in

its favor because Caribbean I's material omissions in the application and renewal processes entitle Great American to rescind the Policy as a matter of law.  This argument hinges on an Alabama statute providing that, in the insurance context, "[m]isrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either ... (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or (3) The insurer in good faith would ... not have issued the policy or contract ... if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."  Ala. Code § 27-14-7(a)(2)-(3).[13]  The availability of § 27-14-7(a) does not hinge on the adequacy or existence of the insurer's own investigation; to the contrary, the mere fact "[t]hat the insurer could make its own investigation does not lessen its right to rely on the representations on the application."  *Nationwide Mut. Fire Ins. Co. v. Pabon*, 903 So.2d 759, 767 (Ala. 2004).

Alabama law is clear that § 27-14-7(a) requires no particular mental state or intent; rather, the statute may operate to rescind a policy even if the insured lacks any intent to deceive. *See Alfa Life Ins. Corp. v. Lewis*, 910 So.2d 757, 762 (Ala. 2005) ("even if innocently made, an incorrect statement that is material to the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy in the manner that it did provides a basis for the insurer to avoid the policy").  All that is needed to trigger § 27-14-7(a) is for the insurer to show (I) that there was a misrepresentation in the insured's application, and (ii) that such misrepresentation was a material contributing influence that induced the insurer to issue the policy.  *Id.*  In this case, Great American has failed to show as a matter of law that each of these necessary prerequisites for rescission is satisfied.[14]

---

[13]  In recent years, the Alabama Supreme Court has expressly extended the reach of § 27-14-7(a) to both original policies and renewal policies of insurance, when a renewal policy is based on a prior application.  *See Ex parte Quality Cas. Ins. Co.*, 962 So.2d 242, 246 (Ala. 2006).  No party here suggests that § 27-14-7(a) is inapplicable because certain alleged misrepresentations were made on renewal application forms rather than the original application.

[14]  Caribbean I urges this Court to reject Great American's rescission argument without even reaching an analysis of § 27-14-7(a).  According to Caribbean I, Great American's failure to return Policy premiums to Caribbean I or to pay them over to the Clerk of Court pending the outcome of litigation amounts to a waiver of its right to rescind.  But the cases it

First, it is far from clear that Caribbean I engaged in misrepresentations at all.  In Great American's words, the omissions in question are these: "Plaintiff never disclosed the ongoing water intrusion, the construction defects or the damage or losses resulting from those defects to Great American."  (Doc. 116, at 21.)  But no questions or instructions in Great American's policy application documents specifically prompted Caribbean I to enumerate all known construction defects or maintenance problems in the Building, to set forth the Building's history of water intrusion, to disclose whether Caribbean I was or had previously been involved in litigation with the Building's contractors regarding alleged construction defects, or the like.  In lieu of any such direct, targeted inquiries, Great American predicates its misrepresentation argument on the "Loss History" section of the application which requested that Caribbean I "enter all claims or losses (regardless of fault and whether or not insured) or occurrences that may give rise to claims for the prior 5 years."  (Defendant's Exh. 7.)  Significantly, "claims or losses" is not defined in the application, and Great American does not suggest that this term was ever explained to the insured.  Caribbean I answered the question by checking the box for "None."  It is not obvious, as a matter of law, that the terms "claims or losses" and "loss history"

---

cites for this proposition deal with circumstances in which an insurer accepts premiums after learning of a ground of forfeiture, then fails to return those payments promptly to the insured. *See, e.g., Ex parte Ikner*, 682 So.2d 8, 10 (Ala. 1996) ("when an insurer has knowledge of a fact or situation that ... would render the policy void and worthless, but nonetheless continues to accept premium payments from its insured, it will be considered to have waived that provision and will be estopped from using that provision to deny a claim"); *Henson v. Celtic Life Ins. Co.*, 621 So.2d 1268, 1277 (Ala. 1993) ("the insurer must return the premiums within a reasonable time to avoid waiver or estoppel ... arising from the acceptance of premiums" after learning of a ground for forfeiture).  There is no allegation or evidence here that Great American accepted premium payments from Caribbean I after becoming aware of the alleged misrepresentations in the insurance applications, so these cases are distinguishable.  Furthermore, the cases cited by Caribbean I on this point neither address nor in any way implicate § 27-14-7(a), and it does not appear that any Alabama state court has engrafted *Ikner* / *Henson* principles onto the § 27-14-7(a) analysis in a published decision.  Certainly, nothing in the text of § 27-14-7(a) would negate an insurer's right to rescind if policy premiums are not tendered back to the insured within a particular time frame.  The Court therefore does not find that Great American is categorically barred from seeking rescission under principles of waiver and estoppel because it has not already returned the premiums to its insured.  That said, if the jury finds at trial that Great American is entitled to rescind the policy pursuant to § 27-14-7(a), this Court will require tender of the Policy premium by Great American back to Caribbean I as a condition of rescission.

would encompass matters such as construction defects; sporadic, minor water leaks for which no claims had been made or were contemplated; and disputes between the insured and its contractors regarding whether the Building comported with the promised quality standards.[15] Given the ambiguities in the application form, the Court cannot find as a matter of law that Caribbean I's failure to disclose the construction defects and maintenance issues as "claims or losses" amounted to a misrepresentation or omission supporting rescission under § 27-14-7(a).[16]

Second, even if the Court were to assume that Caribbean I did misstate its loss history by omitting references to contractor disputes, water intrusion, and alleged construction defects, Great American would still not be entitled to summary judgment because the Court cannot conclude as a matter of law that any such misrepresentation is material. As the Alabama Supreme Court has stated, "for an insurer to avoid coverage under § 27-14-7, Ala.Code 1975, the representation or omission must have been 'material' to the acceptance of the risk. The question of whether a particular fact is or is not *material* is almost invariably a question for the jury, which is entitled to consider the factual context in which the determination is to be made." *First Financial Ins. Co. v. Tillery*, 626 So.2d 1252, 1255 (Ala. 1993) (citations and internal quotation marks omitted); *see also Lewis*, 910 So.2d at 762 ("The materiality of a misrepresentation on a policy application is generally a jury question under Alabama law."); *Bennett v. Mutual of*

---

[15]    This is particularly true when the table included in the ACORD application form for completing "Loss History" solicited information for "Date of Claim," "Amount Paid," "Amount Reserved," and "Claim Status," none of which would seem relevant to the water intrusion and construction defect issues that Great American contends should have been disclosed in that document.

[16]    To the extent that Great American would base its misrepresentation argument on its insured's omissions in response to quote letters, the same analysis applies. For example, the Crump quotation confirmation letter dated August 1, 2002, and addressed to Caribbean I's agent, states as follows: "our files indicates [*sic*] that this insured has had no property losses during the current policy term. If your agency becomes aware of any loss/claims on this account, please notify me prior to the effective date of this renewal, so that the company may reevaluate the terms and their quote. Loss claims activity includes but is not limited to, losses not yet reported, losses not covered by this current policy or self-insured losses, and losses below their deductibles." (Stephenson Aff., at Exh. B.) It remains ambiguous as to whether the problems Caribbean I was experiencing with its contractors pertaining to alleged construction defects and water intrusion constitute "losses" of any stripe. The term "loss" is undefined in Crump's letter.

*Omaha Ins. Co.*, 976 F.2d 659, 661 (11th Cir. 1992) (similar, and noting Alabama courts' reluctance to remove materiality issue from the province of the jury). The mere fact that Great American has offered affidavits from its underwriting personnel (Gardner) and its agent (Stephenson) stating their belief that the omission of this information was material does not conclusively make it so.[17] *See, e.g., Bennett*, 976 F.2d at 661 ("under Alabama law, the uncontradicted testimony of an insurance company's underwriter that a misrepresentation was material and that the company in good faith would not have issued the policy as written, is not necessarily dispositive"); *Tillery*, 626 So.2d at 1255 ("insurers are not allowed to avoid coverage in every case of a misstatement by the insured, and the insurer cannot be allowed automatically to avoid coverage simply because its own employee testified that the company would not have undertaken the risk had it known the truth as to the particular fact"). In keeping with these authorities, it is for the jury – and not this Court – to pass judgment on the materiality of this information to Great American's acceptance of the risk.

To be sure, certain types of misrepresentations have been deemed material as a matter of law, where they "increase the risk of loss as a matter of law." *Lewis*, 910 So.2d at 762. Great American attempts to align itself with this strand of caselaw, arguing that *Lewis* presented "nearly identical circumstances" to those here. (Doc. 116, at 19.) The court disagrees. In *Lewis*, a life insurance company included on its application a specific inquiry as to whether the applicant had been diagnosed or hospitalized for congestive heart failure in the previous 24 months, and indicated that an affirmative answer would render the applicant ineligible for coverage. The applicant answered the question negatively, even though she had indeed been diagnosed with congestive heart failure within the previous 24 months. The *Lewis* court deemed this omission material as a matter of law, entitling the insurer to rescind the life insurance policy pursuant to § 27-14-7(a). *Id.* The case at bar is distinguishable because (a) Great American

---

[17]    In particular, a representative of Great American's agent, Crump, has averred that, had she known of "the extent of the water intrusion problems and the lawsuit related to these problems," she believes Great American would not have issued the Policy. (Stephenson Aff., ¶ 9.) And a Great American underwriter has averred that the Policies would not have been issued had Great American known of the water intrusion problems or the *Trustmark* Litigation. (Gardner Aff., ¶ 10.)

never asked its insured any specific questions about construction defects, maintenance problems, or litigation history of the Building; (b) Great American never cautioned its insured that an affirmative answer to any such questions (had they been asked) would have disqualified it from coverage; and (c) while an applicant's recent history of congestive heart failure is obviously material to the insurer's willingness to issue a life insurance policy, the same cannot be said of ongoing maintenance problems and construction litigation whose severity and nexus to the risk insured against is a matter of uncertainty at this time.[18]

For all of the foregoing reasons, the Court finds that genuine issues of material fact on the existence of misrepresentations and the materiality of any such misrepresentation by the insured to the insurer preclude the granting of judgment as a matter of law to Great American pursuant to Alabama Code § 27-14-7.[19]

―――――――――――――――

[18]     By way of example, a Great American representative, Gardner, testified that, even taking into consideration all information now known concerning construction defects, prior leakage problems and the *Trustmark* Litigation, the Building satisfied each and every one of Great American's guidelines for issuance of wind-driven rain coverage.  (Gardner Dep., at 38-39.)  This situation is clearly not like a life insurance policy application, wherein an applicant's history of serious heart problems is a common-sense dealbreaker for coverage.  Great American's own witnesses testify that the Building would have satisfied all of its guidelines for wind-driven rain coverage even if Great American had known the truth of the matters encompassed by the alleged misrepresentations.  As such, the Court cannot deem these circumstances to fit within Alabama law's narrow band of cases wherein a misrepresentation on an insurance application may be deemed material as a matter of law and the rescission issue taken away from the jury.  Great American's argument to the contrary – namely, that these purported misrepresentations did not affect the insured's eligibility for wind-driven rain coverage but instead affected its overall eligibility for property insurance coverage in some other unspecified manner – is factually undeveloped and conclusory, and cannot be credited at the summary judgment stage.  Moreover, it is important to recognize that the Policy did not purport to insure the Building against construction defects; to the contrary, the Policy excluded coverage for losses caused by such defects.  If Great American was excluding coverage for losses caused by construction defects, then why would knowledge of the presence of such defects be material to its policy underwriting and issuance processes?  Defendant has not satisfactorily answered that question, but has instead relied on conclusory statements of materiality by Gardner and Stephenson.

[19] In the interests of judicial economy, the Court's analysis of the rescission issue does not include comprehensive discussion of the many lesser, underdeveloped arguments and counterarguments that the parties have included.  For example, Defendant suggests that

Caribbean I's failure to report the prior water leaks amounted to a violation of the "Transfer of Rights" clause of the Policy, which provides that if an insured "to whom we make payment ... has rights to recover damages from another, those rights are transferred to us to the extent of our payment," after which the insured "must do everything necessary to secure our rights." (Defendant's Exh. 12, at GAIC 00014.)  However, Great American had never made a payment to Caribbean I for any losses predating Hurricane Ivan, and Caribbean I had never made a claim under the Policy for any losses predating Hurricane Ivan; therefore, the "Transfer of Rights" clause does not appear to come into play.  Even if it did, nothing in that language reasonably supports an expanded reporting obligation by the insured.  Also flawed is Great American's attempt to parlay the expansive Policy coverage interpretation espoused by Caribbean I's Rule 30(b)(6) deponent, Bob Uphaus, into a broader reporting obligation than that set forth in the application, the correspondence, and the Policy itself.  Great American's position is that if the Policy's coverage is as broad as Uphaus says it is (which it plainly is not), then Caribbean I had a contractual duty to report all of these prior instances of water intrusion, which would be covered under that (inaccurate) view of the Policy.  A witness's unilateral interpretation of contract language is not a basis to devise a more onerous loss reporting requirement than the insurer has imposed in the Policy and application.

As to the plaintiff's arguments, Caribbean I insists that several of the application forms are "blank" because they were never signed by Caribbean I, but only by its agent, and suggests that any misrepresentations therein are not attributable to Caribbean I.  (Doc. 124, at 11-13.)  Leaving aside troubling agency concerns implicated by that assertion, the original application was signed by Bob King of Caribbean I.  (*See* Defendant's Exh. 7.)  Any misrepresentation in that document was squarely and unequivocally plaintiff's.  Next, Caribbean I urges the Court to disregard the Gardner Affidavit under the Eleventh Circuit's "sham affidavit" rule.  Binding authority cautions that this rule "is applied sparingly because of the harsh effect it may have on a party's case." *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007) (citation and internal quotations omitted).  For that reason, this Circuit "require[s] the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Id.* (citation omitted).  No such inherent inconsistency appears here.  Plaintiff also maintains that Great American has, through its application language, waived the default rescission standard provided by § 27-14-7(a), and has instead elected a much more rigorous standard providing for rescission only in the case of knowing and intentionally fraudulent statements. *See generally In re HealthSouth Corp.*, 308 F. Supp.2d 1253, 1270 (N.D. Ala. 2004) (summarizing Alabama authorities permitting insurer to utilize policy terms to narrow bases for rescission to provide greater protection for insured than is set forth in § 27-14-7(a)).  But the language cited by Caribbean I says nothing about rescission or the grounds under which rescission is permissible, such that it cannot reasonably be viewed as modifying the § 27-14-7(a) standard.  Finally, Caribbean I contends that Great American waived the right to rescind the Policy by failing to articulate that basis for denying liability in its original May 2005 denial letter. *See, e.g., First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1063 (11th Cir. 1990) ("Under Alabama law, when an insurer specifically denies liability on one ground, it waives other grounds or defenses it might later seek to assert.").  But the May 2005

-17-

**B.    Coverage and Exclusion Issues in the Subject Policy.**

Great American next seeks summary judgment on the grounds that the loss in question falls outside the scope of the Policy's wind-driven rain endorsement and, alternatively, is subject to various Policy exclusions.

*1.    Applicable Principles of Alabama Law.*

"General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract." *Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 780 (Ala. 2006); *see also HR Acquisition I Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309, 1314 (11th Cir. 2008) (explaining that, under Alabama law, general rules of contract law govern insurance policies, which courts must enforce as written if terms are unambiguous).[20] Alabama law generally imposes the burden of proof on policy coverage issues on the insured. *See Jordan v. National Acc. Ins. Underwriters Inc.*, 922 F.2d 732, 735 (11th Cir. 1991) ("Under Alabama law the general rule is that the insured bears the burden of proving coverage.").

Under Alabama law, "[t]he issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. ... If the terms within a contract are plain and unambiguous,

---

letter specifically reserves Great American's rights to void coverage on the basis of "fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time," concerning the Building. (Plaintiff's Exh. 12.) That language appears to track the very rescission argument that Great American is making now. Moreover, the November 6, 2007 letter in which Great American advised Caribbean I that there had been no denial of any portion of its claim as of that date. (Plaintiff's Exh. 22.) Stated differently, the record reflects that, notwithstanding the earlier denial, Caribbean I's insurance claim remained open and outstanding as of the date on which the Complaint was filed in this action. Great American set forth misrepresentation as its Fourth Defense in its Answer (doc. 21), so it timely invoked rescission once suit was filed. Under these circumstances, Great American cannot reasonably be deemed to have waived its right to interpose a § 27-14-7(a) affirmative defense.

[20]    *See also Progressive Specialty Ins. Co. v. Naramore*, 950 So.2d 1138, 1141 (Ala. 2006) ("Insurance contracts are to be enforced as they are written, as long as there is no ambiguity in the provisions involved.") (citations omitted); *Shrader v. Employers Mut. Cas. Co.*, 907 So.2d 1026, 1034 (Ala. 2005) ("If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy ... by making a new contract for the parties.") (citation omitted).

the construction of the contract and its legal effect become questions of law for the court."
*Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted); *see also*
*B.D.B. v. State Farm Mut. Auto. Ins. Co.*, 814 So.2d 877, 879 (Ala.Civ.App. 2001) ("The
interpretation of an insurance contract presents a question of law.").   The determination of
whether policy language is ambiguous or unambiguous is critical.   "To the extent the language of
an insurance policy provision is ambiguous, all ambiguities must be resolved against the
insurance company."  *Safeway Ins. Co. of Alabama, Inc. v. Herrera*, 912 So.2d 1140, 1143 (Ala.
2005); *see also HR Acquisition*, 547 F.3d at 1315 ("when doubt exists as to whether coverage is
provided under an insurance policy, the language used by the insurer must be construed for the
benefit of the insured").   That said, ambiguities cannot be constructed from thin air by "strained
or twisted reasoning" in interpreting the language.   *Herrera*, 912 So.2d at 1143.   Furthermore,
"the mere fact that a word or a phrase used in a provision in an insurance policy is not defined in
the policy does not mean that the word or phrase is inherently ambiguous."  *Id.*   Rather, "[i]n
determining whether the language of a contract is ambiguous, courts construe the words
according to the interpretation ordinary men would place on the language used therein. ... The
words are given the meaning that persons with a usual and ordinary understanding would place
on the words."  *Progressive Specialty Ins. Co. v. Naramore*, 950 So.2d 1138, 1141 (Ala. 2006)
(citations and internal quotations omitted); *see also Herrera*, 912 So.2d at 1143 (similar).

### 2.      *Whether Plaintiff Experienced a Covered Loss.*

As noted, the Policy contains a wind-driven rain endorsement that extends coverage to
Caribbean I, up to a limit of $1 million, for "wind driven rain that seeps or leaks through doors,
windows or other openings," subject to the proviso that coverage is unavailable if the Building's
"roof, walls, doors, ceilings, windows or foundations, has sustained damage."  (Defendant's Exh.
12, at GAIC 00048.)  Great American's position on summary judgment is that the wind-driven
rain endorsement is inapplicable because "the damages claimed by Plaintiff ... were not caused
by water that seeps or leaks through doors, windows or similar openings," but instead "were due
to water intruding through construction defects, which lead to cracks in the exterior of the
building."  (Doc. 116, at 22.)   However, Great American does not point to sufficient facts to
support this conclusory statement of causation.   Thus, it is still a matter of disputed fact whether

all of the water damage to the Building during Hurricane Ivan was attributable to "water intruding through construction defects" and that none of it was "caused by water that seeps or leaks through doors, windows or similar openings."  The summary judgment movant has failed to satisfy its "initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark,* 929 F.2d at 608.  For that reason, this ground for Rule 56 relief is denied.[21]

3.     *Whether Coverage is Barred by Applicable Policy Exclusions.*

Under Alabama law, the burden of proving applicability of a policy exclusion rests with the insurer.  *See Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 12 (Ala. 2001).  Exceptions to coverage are interpreted as narrowly as possible to maximize coverage, and are construed strongly against the insurer.  *See Porterfield v. Audobon Indem. Co.*, 856 So.2d 789, 806 (Ala. 2002); *Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1263 (11th Cir. 2007) (noting that, under Alabama law, coverage exceptions are interpreted narrowly and "clauses setting out exceptions must be construed most strongly against the company that issued the policy").  "If a given exclusion is ambiguous, it will be construed so as to limit the exclusion to the narrowest application reasonable under the wording."  *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts Bros., Inc.*, 550 F. Supp.2d 1295, 1304 (S.D. Ala. 2008) (citation omitted).

Great American maintains that it is entitled to summary judgment on the basis of two

---

[21] Defendant also argues in its reply brief, for the first time, that Caribbean I's proof of causation is deficient because (i) plaintiff's expert witness's opinions are inadmissible *ipse dixit*, and (ii) such proof fails to quantify the relative magnitudes of damage caused by wind-driven rain within the Policy coverage, and that caused by water outside the scope of the wind-driven rain endorsement.  It is common practice that federal courts do not consider arguments raised for the first time in a reply brief.  *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.").  The Court notes, however, that defendant has since filed a *Daubert* motion concerning Caribbean I's expert witness.  That motion is now fully briefed and will be discussed at the pretrial conference.

distinct Policy exclusions, specifically those numbered 2.d.(2) and 2.f.[22]  Section 2.d.(2) excludes "loss or damage caused by or resulting from ... hidden or latent defect or any quality of the property that causes it to damage or destroy itself."  (Defendant's Exh. 12, at GAIC 00025.) Great American characterizes the construction defects as hidden or latent defects that caused the Building to destroy itself.  Be that as it may, the problem once again has to do with the absence of record facts (much less uncontroverted record facts) to support movant's position.  To be sure, there is record evidence that the Building had construction defects (primarily to its walls) that allowed water to enter the premises at various times.  But there is also record evidence that the Building sustained wind-driven rain damage during Hurricane Ivan.  Such wind-driven rain damage entering through doors, windows or other openings would not <u>necessarily</u> be the product of a "hidden or latent defect" of the sort that this exclusion targets.  Was the damage for which Caribbean I seeks coverage caused by construction defects or by wind-driven rain penetrating doors and windows?  The facts on this point are contested.  In the absence of a showing by defendant that, as a matter of undisputed fact, Caribbean I's loss was attributable to construction defects rather than wind-driven rain leaking through doors and windows, summary judgment on the basis of the "hidden or latent defect" exclusion is inappropriate.[23]

---

[22]      Great American's principal brief includes block quotations of several other exclusions, including exclusions 2.m. and 3.c.  (Doc. 116, at 11-12.)  In the absence of any discussion or analysis of those exclusions in movant's principal brief, however, the Court will not consider or apply them for purposes of the pending Motion for Summary Judgment.

[23]      In so concluding, the Court expressly declines to adopt the Policy interpretation of exclusion 2.d. advanced in Caribbean I's brief.  Caribbean I cites language in exclusion 2.d. that if an "excluded cause of loss" (including hidden or latent defects, or cracking) results in a "specified cause of loss" (including water damage), Great American will pay for the loss or damage caused by that specified cause of loss.  (Doc. 124, at 21-22.)  Caribbean I reasons that, since Great American admits that the cracking of the Building's walls led to water damage, Great American is on the hook to pay for all such water damage by the terms of exclusion 2.d. The Court cannot agree.  "Water damage," as that term is used in the "specified cause of loss" section, is specifically defined to mean "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of ***any part of a system or appliance ... containing water or steam***."  (Defendant's Exh. 12, at GAIC 00040 (emphasis added).)  Cracking walls in the Building cannot reasonably be viewed as a "system or appliance containing water or steam"; therefore, this "specified cause of loss" language in exclusion 2.d. is inadequate to confer coverage on Caribbean I.

Alternatively, Great American urges the Court to deem Caribbean I's claims excluded under the Policy as a matter of law pursuant to the exclusion found at 2.f. for "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." (Defendant's Exh. 12, at GAIC 00026.) Defendant is correct that there is record evidence of repeated seepage or leakage of water into the Building, well in excess of the requisite 14-day period. However, there is still a factual dispute as to whether Caribbean I's claimed loss arises from those continuous, repeated seepages of water over time, or from the one-time event of Hurricane Ivan driving sheets of rain through the Building's windows and doors.[24]   In Alabama, it is a "settled rule that the question of proximate cause is usually a question of fact for the jury." *Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So.2d 84, 100 (Ala. 2004) (citations omitted); *see also Dixon v. Board of Water & Sewer Com'rs of the City of Mobile*, 865 So.2d 1161, 1165 (Ala. 2003) ("the question of proximate cause is almost always a question of fact to be determined by the jury"). Great American has presented the Court with no reason to depart from that bedrock principle here.

### C.    The "Expected Loss" Issue.

As a separate ground for seeking summary judgment, Great American invokes the

---

[24]    The presence of 14 days of water infiltration does not invalidate the Policy and negate any claims the insured may make from that moment forward. Rather, that exclusion merely excludes from coverage "loss or damage caused by or resulting from" that continuous, repeated water infiltration. Stated differently, for this exclusion to apply, Great American must show that the loss was caused by or resulted from that repeated seepage over time, rather than by the singular event of Hurricane Ivan. In its reply brief, Great American criticizes this reading of the exclusion, asserting that exclusion 2.f. "does not contain any requirement that the leakage or seepage be from the same source or cause." (Doc. 134, at 12.) Defendant would lump Hurricane Ivan water leakage in with the prior water leakage, finding all such water leakage to be a single unified, excluded event. But such a reading improperly conflates two distinct causes of loss and expands exclusion 2.f. beyond the strict, narrow reading required by Alabama law. Exclusion 2.f. does <u>not</u> state that all water damage is automatically excluded if the Building has leaked for more than 14 days. Instead, it merely excludes coverage for damage caused by "[c]ontinuous or repeated seepage or leakage of water ... that occurs over a period of 14 days or more." In the light most favorable to Caribbean I, the evidence is that the damages it claims were not caused by a continuous or repeated seepage of water, but were instead caused by the one-time event of Hurricane Ivan. If this evidence is accepted as true, then exclusion 2.f. cannot apply because Caribbean I is claiming damage caused by a one-time catastrophic intrusion of wind-driven rain, rather than for damage caused by the cumulative effects of frequent minor leaks.

overlapping doctrines of "expected loss," "loss in progress," "known loss," and "fortuity."  (Doc. 116, at 26-28.)  According to Great American, the basic premise of all of these doctrines is the same, to-wit: that insurance is not available for losses the insured knows of, plans, expects, intends, or is aware are substantially certain to occur, but is instead confined to losses that are unplanned, unintentional and that occur by chance or accident.  (Doc. 116, at 26-28.)

Great American's appeal to the "expected loss" family of theories is misplaced for two reasons.  First, Alabama law does not recognize any of these doctrines, independent of express exclusions in the policy language.  Defendant directs the Court to an unpublished Ninth Circuit decision applying California law, a Tenth Circuit case, a Minnesota state court case, an Illinois state court case, and a federal district court case from New York.[25]  However, in the absence of any authority that these theories comport with Alabama law, or that Alabama courts would embrace these principles if given the opportunity, the Court will not adopt defendant's theory.  *See generally Allapattah Services, Inc. v. Exxon Corp.*, 362 F.3d 739, 755 (11th Cir. 2004) ("Diversity-based suits necessarily involve questions of state law, which should presumptively be left to state tribunals."); *Delahanty v. Hinckley*, 845 F.2d 1069, 1070 (D.C. Cir. 1988) (opining that federal courts sitting in diversity should normally decline to speculate on questions of local doctrine, such as where party asked federal court to determine whether D.C. courts would embrace a novel tort doctrine that had never been presented to them).

---

[25]  These doctrines have not been universally embraced in this country.  *See, e.g.,* 7 *Couch on Insurance* (3rd ed.), § 102:8 ("Not all courts have subscribed to these theories as separate defenses to an insurer's liability, however, some having explicitly rejected this concept, while others have apparently yet to consider the point.") (footnotes omitted).  The Court's own research, coupled with that set forth in the parties' briefs, suggests that Alabama courts have not endorsed any categorical limit on coverage for expected losses, but have instead ventured no further than to enforce policy language excluding coverage for expected or intended losses.  *See, e.g., State Farm Fire & Cas. Co. v. Chestang*, 952 So.2d 1101, 1104-05 (Ala. 2006) (construing and applying explicit policy exclusion for damage "which is either expected or intended by the insured"); *Continental Cas. Co. v. Plantation Pipe Line Co.*, 902 So.2d 36, 42-43 & n.5 (Ala. 2004) (applying policy exclusion for bodily injury or property damage that was "expected or intended from the standpoint of the insured").  Of course, *Chestang* and *Plantation Pipe* are inapposite, inasmuch as Great American does not rely on any "expected or intended loss" language in the Policy itself, but instead predicates its "expected loss" argument solely on a legal doctrine extrinsic to the Policy, albeit one that Alabama courts do not appear to have adopted or applied.

Second, even if the "expected loss" category of limits on insurance coverage was recognized under Alabama law, Great American's showing on summary judgment is inadequate to entitle it to judgment as a matter of law on that basis. Great American points to no record evidence, disputed or otherwise, that Caribbean I expected the catastrophic wind-driven rain damage to the Building caused by Hurricane Ivan, planned such damage, intended such damage, or was aware that such damage was substantially certain to occur at the time that it contracted with Great American for insurance coverage. Defendant's position is that "Caribbean I knew that there were significant construction defects with its building" allowing water to intrude into the building, and that "[b]asic logic dictates that if a building leaks when it rains ..., it will leak when a significant weather event occurs, such as a hurricane." (Doc. 134, at 12.) This reasoning is unpersuasive. Once again, the fundamental problem is that, as noted *supra*, Great American has failed to establish, as a matter of undisputed fact, a causal nexus between the pre-existing construction defects and the water damage to the Building in Hurricane Ivan for which Caribbean I claimed coverage. If, as the insured's evidence shows, the hurricane damage was unrelated to and separate from the pre-existing construction defects, then the insured's prior knowledge of construction defects in the Building could hardly create an expectation, much less substantial certainty, on the part of Caribbean I that the Hurricane Ivan damage would occur because these construction defects had nothing to do with the hurricane damage. On this record, the Court cannot conclude as a matter of law that coverage is barred by the "expected loss" doctrine, or any of the various iterations or subsets of same, even if Alabama courts would recognize such a theory of liability avoidance for insurers.

### D.    *Whether Caribbean I Complied with Its Contractual Duties After Loss.*

As its final basis for seeking summary judgment, Great American argues that Caribbean I's claims are precluded by its failure to comply with its contractual duties after loss, specifically the requirement that it submit to an examination under oath.

Unquestionably, the Policy's "Duties in the Event of Loss or Damage" section included a provision extending to the insurer the right to examine Caribbean I under oath "at such times as may be reasonably required." (Defendant's Exh. 12, at GAIC 00015.) Such provisions are plainly enforceable under Alabama law. Indeed, courts have routinely upheld the validity of

such "duties after loss" provisions obliging an insured to furnish information and documents to the insurer. *See, e.g., Nationwide Ins. Co. v. Nilsen*, 745 So.2d 264, 267 (Ala. 1998) ("An insurance company is entitled to require an insured to submit to an examination under oath as part of its claims investigation process. ... Moreover, an insurer's obligation to pay or to evaluate the validity of an insured's claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims.") (citations omitted).[26] Similarly, Alabama law is clear that an insurer's obligation to pay covered claims under a policy of insurance is not activated until the insured complies with reasonable requests for statements and documents pursuant to a "duties after loss" provision. *See Nilsen*, 745 So.2d at 266 (where insurance policy's "duties after loss" section required insured to submit to examination under oath, insured's submission to such examination was a condition precedent, such that "[o]nly after complying with that condition could he recover under the insurance contract"); *Akpan v. Farmers Ins. Exchange, Inc.*, 961 So.2d 865, 872 (Ala.Civ.App. 2007) (where insureds declined to submit to examinations under oath, insurer "could not be held to have violated a contractual obligation to pay the Akpans' claims when the Akpans had failed to comply with a condition precedent to recovery under their insurance contract").

The record establishes that on November 6, 2007, Great American invoked its right to require Caribbean I to submit to an examination under oath and designated January 8, 2008 as the date for that examination. There is no evidence that Caribbean I refused to attend the examination under oath or announced its intention not to participate. However, the record, viewed in a light most favorable to Carribean I, reflects that the examination under oath was canceled unilaterally by Great American on January 4, 2008, in reaction to Caribbean I having filed suit for appraisal (not damages) in the interim.

Great American argues that "Caribbean I breached the terms of the policy, and that results in a forfeiture of coverage." (Doc. 116, at 30.) However, defendant fails to satisfactorily

---

[26]     *See also Merchants Ins. Co. v. Lilgeomont, Inc.*, 84 F.2d 685, 687 (5th Cir. 1936) ("The contractual provision for discovery of books and papers and of material facts known to the insured is reasonable and valid."); *Laine v. Allstate Ins. Co.*, 355 F. Supp.2d 1303, 1305 (N.D. Fla. 2005) ("The law is settled that an insurance policy provision requiring an insured to submit to an examination under oath is lawful and binding.").

explain how its own unilateral cancellation of the examination under oath amounts to a breach of plaintiff's duty to submit to such an examination under oath.  Defendant likewise fails to provide any argument, policy language, or authority supporting its apparent position that Caribbean I's filing of a lawsuit to compel appraisal prior to the appointed date for the examination under oath is tantamount to a refusal by Caribbean I to participate in such an examination under oath, or otherwise amounts to a breach of its contractual duties after loss.  The Court is not aware of either authority or a Policy provision that forbids an insured from filing suit against an insurer until after any examination under oath scheduled by the insurer has taken place.

The undisputed evidence before the Court is that the only reason the examination under oath did not occur on January 8, 2008, as scheduled, is because Great American canceled it and never reset it, even when Caribbean I volunteered to submit to a rescheduled examination.  This course of conduct by the insurance company cannot be parlayed into a breach of contractual duties after loss on the part of the insured.[27]

**V.     Conclusion.**

---

[27]     In the final paragraph of its 30-page principal brief, Great American tacks on an argument that Caribbean I "violated the terms of the Policy by failing to preserve any of Great American's rights as part of the settlement in the Trustmark litigation."  (Doc. 116, at 30.)  Although this argument, is not fleshed out Great American appears to be invoking the "transfer of rights" clause in the Policy which provides that if an insured "to or for whom we make payment ... has rights to recover damages from another, those rights are transferred to us to the extent of our payment. [The insured] must do everything necessary to secure our rights and must do nothing after loss to impair them."  (Defendant's Exh. 12, at GAIC 00014.)  Great American is apparently contending that Caribbean I's release of the contractors and builders involved in the *Trustmark* Litigation impairs Great American's subrogation rights against those entities for "leaks attributable to construction defects."  (Doc. 116, at 30.)   This argument is puzzling.  The parties appear to be in agreement that the *Trustmark* Litigation related to construction defects at the Building.  The parties likewise appear to concur that losses caused by construction defects are not covered under the Policy.  As a result, any payment that Great American may make to Caribbean I in this action could not be for construction defects, because losses caused by construction defects are not covered.  So what interest could Great American possibly have in pursuing subrogation claims against Caribbean I's contractors for alleged construction defects in the Building?  Nor does defendant identify any scenario in which Caribbean I could possibly have the right to recover damages from the *Trustmark* Litigation parties for damages covered by the Policy (*i.e.*, for wind-driven rain damage to the Building <u>not</u> caused by construction defects).  As such, this "transfer of rights" argument is not a viable basis for Rule 56 relief.

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 115) is **denied** in its entirety.

DONE and ORDERED this 12th day of February, 2009.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**