**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CARIBBEAN I OWNERS'** | ) | |
| **ASSOCIATION, INC., an Alabama not for** | ) | |
| **profit corporation** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 07-0829-WS-B** |
| | ) | |
| **GREAT AMERICAN INSURANCE** | ) | |
| **COMPANY OF NEW YORK, a New York** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MOTION IN LIMINE
TO EXCLUDE OR LIMIT CERTAIN TESTIMONY OF DEFENDANT'S
WITNESSES OFFERED BY DEPOSITION DESIGNATION[1]**

COMES NOW the plaintiff and moves the Court *in limine* to exclude or limit the

testimony of certain defendant's witnesses, namely:   Ralf Leistikow, Jeremy

Gildenmeister, Kelly Lee Murphy, Masie Marie Murphy, Betsy Farnsley, Dorothy

Dianne King, Hugh Lott, Michael Murphy, III, Michael Garfield Murphy, Sr., Vincent

Smith, and Bob King, whether such testimony is live[2] or offered by way of deposition,

and requests that the defendant, their attorneys, their witnesses, and anyone associated

---

[1] This motion is a combination of the plaintiff's contemplated motions identified in the parties joint pretrial document listed in section F. 1. including subparts: C, D, E, & I. Rather than filing 4 different motions and briefs, the plaintiff thought that economy would be best served by addressing issues that may overlap with the various witnesses in one document.

[2] To the extent that plaintiff's objection to testimony is based upon the failure of the defendant to disclose the witness as an expert pursuant to FRCP 26(a)(2) and the Court's pretrial order as addressed in Section II below, the plaintiff objects to any defendant witness who would offer expert testimony except those properly disclosed.

with the defendants in this action be prohibited from mentioning or referring to, or eliciting any mention or reference to, in any way, during voir dire questioning of the jury panel, opening statements, questioning of the witnesses, testimony, reading deposition excerpts into evidence, closing arguments, or remarks of any kind during the trial of this action, any reference to such excluded testimony specifically addressed as follows:

**I.      The Plaintiffs Cannot Use the Former Deposition Testimony of Witnesses in the Trustmark Litigation Because They Have Not Proved the Witnesses are Unavailable under FRE 804(a) and that the Plaintiff Had a Similar Motive to Cross Examine Under FRE 804(b)(1)**

The defendant seeks to introduce, or read to the jury at trial, the deposition testimony of several witnesses whose depositions were taken in another case involving the same plaintiff, but against the original contractor and others regarding the Caribbean I condominiums. The prior litigation has been previously referred to as the Trustmark Litigation throughout these proceedings. The deposition testimony includes that of: Ralf Leistikow, Jeremy Gildenmeister, Kelly Lee Murphy, Masie Marie Murphy, Betsy Farnsley, Dorothy Dianne King, Hugh Lott, Michael Murphy, III, Michael Garfield Murphy, Sr., Vincent Smith, and Bob King.[3] (See Defendant's deposition designations contained in Joint Pretrial Document (Doc. 137, Attachment 6, G-3). The plaintiff moves that the court exclude and prohibit the defendant from using the prior deposition testimony from the Trustmark litigation for each of these witnesses because the defendant has failed to meet their burden in proving that the witnesses are (1) unavailable and (2) that the plaintiff in the prior action had an opportunity <u>and similar motive to develop the testimony by direct, cross, or redirect examination.</u>

---

[3] Bob King is the only one of the stated witnesses that was also deposed in the present case.

Under Federal Rule of Evidence 804, the unavailability of a witness and the use of former testimony as an exception to the hearsay rule are addressed as follows:

> **(a) Definition of unavailability.** "Unavailability as a witness" includes situations in which the declarant--
>
> **(1)** is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or
> **(2)** persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or
> **(3)** testifies to a lack of memory of the subject matter of the declarant's statement; or
> **(4)** is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
> **(5)** is absent from the hearing <u>and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means.</u>
> A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.
> **(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> **(1) Former testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity <u>and similar motive to develop the testimony by direct, cross, or redirect examination.</u>

Federal Rules of Evidence Rule 804(emphasis added).

Addressing the application of FRE 804 and the former testimony exception to the hearsay rule requires a two step inquiry. First, the declarant must be unavailable as that term is defined in Rule 804(a).[4] <u>U.S. v. King</u>, 713 F.2d 627, 630 (11th Cir. 1983). "The

---

[4] Rule 32(a)(3)(B) of the Federal Rules of Civil Procedure provides that "any part of all of a deposition, <u>so far as admissible under the rules of evidence</u> . . . may be used against any party who was present at the taking of the depositions or had reasonable notice

burden of proving the unavailability of a witness under Rule 804(a) rests with the proponent of the hearsay evidence." <u>U.S. v. Acosta</u>, 769 F.2d 721, 723 (11th Cir. 1985)(citing <u>United States v. Amaya</u>, 533 F.2d 188 (5th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977).[5]

In the present case, there is no question that the definitions of unavailability found in FRE 804(a)(1)-(4) do not apply.  This leaves FRE 804(a)(5) as the defendant's sole means of proving unavailability under the rule.  This definition provides that the witness is unavailable if he "is absent from the hearing <u>and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means.</u>" There has been absolutely no showing by the defendant that they have been unable to procure the attendance of the witnesses, whose depositions they seek to read, by process or other reasonable means.  There should be at least a showing by the defendant that they have attempted to serve process upon the witnesses or that they have tried to procure their voluntary attendance before any witness is deemed unavailable.  <u>American Economy Ins. Co. v. Rutledge</u>, 2007 WL  816544 (M.D. Ala. 2007)(court satisfied that counsel had made a "thorough and good-faith effort to procure [witness'] attendance at trial by all reasonable means").

---

thereof, in accordance with the following provisions. . . (3) The deposition of a witness whether or not a party, may be used by any party for any purpose if the court finds: . . . (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, . . . unless it appears that the absence of the witness was procured by the party offering the deposition. . . . <u>Id.</u>  The party seeking admission of the testimony bears the burden of proving the requirements of both Rule 32(a)(3) and FRE 804(b)(1).  See <u>In re Air Crash Disaster at Stapleton Intern. Airport, Denver, Colo</u>., 720 F.Supp.  1493 (D. Colo. 1989).

[5] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

In addition, it is expected that the defendant may argue that some or all of the witnesses are beyond the subpoena power of the court and therefore any attempt to serve process upon them would be futile.  It is also expected that the defendant will rely upon the residence of the witnesses as of the date their depositions were taken.  All of the depositions were taken in 2005 or 2006—most over 2 years ago and several over 3 years ago.[6]  Certainly some of the witnesses could now live within the jurisdiction of this court and be subject to the court's subpoena power.  The defendant could thus compel their attendance, but the burden rests upon the proponent of the testimony to show what efforts they have taken in seeking the witnesses' attendance at trial.  The defendant should be required to show that they have made inquiry as to the current residence of the witness and what goof faith efforts have been made to procure their attendance at trial before the court determines any witness is unavailable.

In addition, the plaintiff plans on calling Bob King to testify at trial.  The presence of the witness at trial destroys the first requirement of the definition of "unavailable" under FRE 804(a)(5) that the witness must be "absent from the hearing."  Since Bob King will not be "absent from the hearing," his former testimony is inadmissible as hearsay, not within the exception to former testimony of FRE 804.

A showing of unavailability is a prerequisite to admission of evidence under FRE 804(b)(1).  Driscoll v. Schmitt, 649 F.2d 631, 632 (8th Cir. 1981).  Without a showing of

---

[6] The deposition dates for each of the witnesses is as follows:  Ralf Leistikow (October 17, 2006), Jeremy Gildenmeister (March 16, 2006), Kelly Lee Murphy (November 13, 20006), Masie Marie Murphy (November 30, 2006), Betsy Farnsley (November 30, 2006), Dorothy Dianne King (November 14, 2006), Hugh Lott (November 13, 2006), Michael Murphy, III (November 13, 2006), Michael Garfield Murphy, Sr. (December 9, 2005, November 30, 2006), Vincent Smith (September 12, 2006, October 11, 2006), and Bob King (August 5, 2005).  Exhibit A (collectively the first page of each of the referenced depositions designating the deponent and date of deposition).

unavailability, the inquiry concerning the admissibility of the deposition testimony from the Trustmark Litigation should go no further and the testimony should be excluded as hearsay.

Once the proponent of the testimony establishes unavailability of the witness under FRE 804(a), he must then show that the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.  See U.S. v. Salerno, 505 U.S. 317, 322, 112 S.Ct. 2503, 2507 (1992).

It is clear that the motive of the plaintiff in the Trustmark litigation was completely opposite to its motive in the present case.  In the Trustmark case, the motive of the plaintiff was to show the defects in the Caribbean I building attributable to the general contractor.  Although the depositions were taken after damage was incurred from Hurricane Ivan, the plaintiff's motive in the Trustmark case was not to show damage caused by the hurricane, but from the defects caused by Trustmark in the construction process.  The plaintiff in the present case had no motive whatsoever to show the extent and nature of the damages to the condominium from Hurricane Ivan in the Trustmark case.[7]  The motive of the defendant Trustmark in the prior litigation may have been to

---

[7] The court should also consider the defendant's failure to depose this list of witnesses in the present case.  See Nelson v. Fibreboard Corp., 912 F.2d 469 (9th Cir. 1990).  Although there are discovery motions currently pending with regard to the defendant's desire to depose Leistikow and Smith after the discovery cut-off in this case, neither of the witnesses were disclosed by the defendant as expert witnesses in this case.  Even if the court were to allow the depositions to be taken, which would satisfy the Rule 804(b)(1) requirements with regard to such testimony (assuming unavailability at trial) the defendant would still face exclusion of the testimony due to the defendant's failure to disclose them as experts under FRCP 26(a)(2) and the court's pretrial order as addressed below.  Hence, the issue is not mooted by simply allowing the depositions to proceed.  As

shift the focus from defects in the building to damage caused by the hurricane, but Rule 804(b)(1) speaks to the motive of the party against whom the testimony is offered.  In this instance, the motive of the property owners' association plaintiff is the focus of the inquiry and no one else's motive is relevant.  It is clear that the purpose of the two cases and the damages alleged in each are completely different.  The parties apparently agree "that that the Trustmark Litigation related to construction defects at the Building . . . [and] that losses caused by construction defects are not covered under the policy."[8]  Just because some of the deposition testimony may prove helpful or consistent with the position taken by the defendant in the present case, does not affect the admissibility of the evidence under FRE 804(b)(1).   See Baylor v. Jefferson County Bd. of Educ., 733 F.2d 1527, 1534 (C.A. Ala. 1984)(A transcript of another proceeding cannot be admitted in evidence merely because the defendant wants it to be).   Both Leistikow and Smith testified in their prior depositions that they were not even asked to segregate damage from the hurricane from damage related to defects in the building.  Through these two witnesses, the defendant seeks to back-door expert testimony that was not disclosed and would otherwise be unavailable to them to present.

Having affirmatively shown that the motive of the plaintiff in the two cases were vastly different, the former testimony of the witnesses taken in the Trustmark litigation are hearsay and should be excluded.

---

of the filing of this motion, the parties have not received a ruling on the motion to quash the deposition notices of Leistikow and Smith previously filed.

[8] This Court's order denying defendant's motion for summary judgment recognizes the striking dissimilarity of the Trustmark action versus the issues involved in the present case regarding damage caused by Hurricane Ivan.  See Doc. 148, fn. 27.

## II. The Former Testimony is Due to Be Excluded Based Upon Defendant's Failure to Disclose Witnesses as Experts Under Rule 26(a)(2) and the Court's Pretrial Order

In the unlikely event that the former testimony in the Trustmark litigation is deemed admissible under FRE 804, some of the testimony should still be excluded based upon the defendant's failure to disclose some of the witnesses as experts.  Pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure, "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703 or 705."  Id.  "Under Rule 37(c)(1), a district court clearly has authority to exclude an expert's testimony where a party has failed to comply with Rule 26(a) *unless the failure is substantially justified or is harmless*."  OFS Fitel, LLC v. Epstein, Becker and Green, P.C., 549 F.3d 1344, 1363 (11th Cir. 2008).

Rule 37(c)(1) provides that "[I]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  FRCP 37.

As noted in the previous section, the Defendant has designated certain deposition testimony of several witnesses from the Trustmark case including:  Ralph Leistikow, Jeremy Gildenmeister, and Vincent Smith[9] that it intends to introduce or read to the jury

_____

[9] The testimony of Vincent Smith is also the subject of a separate motion in limine based upon plaintiff's objection to his testimony under Daubert.  Smith's former testimony in the Trustmark litigation should be excluded pursuant to section I, infra, and additionally because the defendant failed to disclose Mr. Smith as an expert as addressed herein.  Smith had been originally designated by plaintiff as an expert, but was later withdrawn.  This fact does not confer upon the defendant the right to "piggyback" plaintiff's original designation of Smith in order to circumvent Rule 26 disclosure requirements.  See Ferguson v. Michael Foods, Inc., 189 F.R.D. 408 (D. Minn. 1999).  Allowing the

in the present case.  The designations of each of these witnesses unquestionably contain expert testimony under FRE 702.  The individual testimony for these witnesses is either set out or summarized below to provide the court with the information necessary to determine that the testimony is clearly FRE 702 testimony.[10]

The defendant's expert witness disclosures were due pursuant to this Court's Amended Scheduling Order on September 18, 2008.  (Doc 83).  On September 18, 2008, the Defendant identified Gary Maylon, Ned Fortenberry, James DuPre, Chris Hurley, and Kimberly Gardner as their only expert witnesses in this case.   (See Exhibit B, Defendant's Expert Disclosures).   Not until just before the proposed joint pretrial document was filed on January 14, 2009, when the defendant designated the deposition testimony of the witnesses stated above, did the plaintiff know that the defendant intended to use expert testimony from witnesses who had not been previously disclosed as experts by the defendant.

"Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational." Reese v. Herbert, 527 F.3d 1253,

---

defendant to call an expert witness who was originally designated by the plaintiff and later withdrawn could have a highly prejudicial impact.  "Jurors unfamiliar with the role of counsel in adversary proceedings might well assume that plaintiff's counsel had suppressed evidence which he had an obligation to offer.  Such a reaction could destroy counsel's credibility in the eyes of the jury." Peterson v. Willie, 81 F.3d 1033, 1037 (11th Cir. 1996)(citation omitted).

[10] In addition to Leistikow, Gildenmeister and Smith which contain almost exclusively expert testimony, Dorothy Diane King and Kelly Lee Murphy's testimony contain a few questions that elicit expert opinions from witnesses who are clearly non-experts.  Their testimony is also addressed specifically below.  Vincent Smith's testimony is addressed in the plaintiff's Daubert motion filed at or near the time of this motion and therefore is not additionally set forth herein.  Such references to Smith's testimony in the plaintiff's Daubert motion are adopted herein to avoid duplication.

1266 (11th Cir. 2008)(citations omitted).  In <u>Reese</u>, the court stressed that Rule 26's "expert disclosure rule is intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."  Id. at 1265 (quotation marks omitted).  To permit the former testimony of Leistikow, Smith, or Gildenmeister to be used in the present case would deprive the plaintiff of any opportunity to present cross examination of the witnesses' testimony.[11] Since these individuals were not identified by the defendant as expert witnesses, the plaintiff was also deprived of the opportunity to retain additional experts or develop testimony from other witnesses in response to the testimony sought now to be presented by the defendant.  The present case is vastly different from the Trustmark Litigation even though the subject of both was alleged damage to the Caribbean condominium building. The prior case involved damage due defects in construction.  The present case seeks damage that occurred due to Hurricane Ivan.  Leistikow and Smith acknowlede in their prior depositions, that they had not been hired to address any damages caused by Hurricane Ivan, nor had they made any attempt to delineate the damage caused by the hurricane versus damage caused by any defects.[12]  To allow such testimony would unfairly and unquestionably prejudice the plaintiff, would reward the defendant's circumvention of Rule 26(a)(2) and the Court's pretrial order expert disclosure requirements and would frustrate the intent and purpose of the rules.

---

[11] This argument is made with regard to the "former testimony" sought to be introduced by way of reading the witnesses' depositions, but would equally apply if the defendant was permitted to bring any of the witnesses live to testify at trial and provide expert testimony.

[12] See fn. 15, supra regarding Leistikow.  Smith testified that he did not delineate between damages caused by defects from those caused by the hurricane.  (Exhibit G, Deposition of Vince Smith, pg. 202, ln. 11 – pg. 203, ln. 6; pg. 203, ln. 21 – pg. 204, ln. 1).

The following sections set out the expert testimony sought to be introduced by the defendant by way of former testimony from the Trustmark Litigation:

**<u>Ralph Leistikow</u> (Trustmark Litigation)**

The defendants seek to introduce the deposition testimony Ralph Leistikow, an expert witness from the prior litigation in the Trustmark.

Mr. Leistikow is an engineer with a master's degree in civil engineering who has worked since 1991 in the construction industry and has experience in construction as an onsite field engineer.  The company that he works for performs design, structural repairs and evaluations.  About five to ten percent of Mr. Leistikow's work over the last 10 years has been litigation related.   (Exhibit C, (hereinafter referred to as "Leistikow depo.") Leistikow depo., pg. 17, ln. 6-16).

Mr. Leistikow was retained as an expert to perform an inspection of the condominium, to perform a structural analysis of the middle stud in-fill wall and to write a report.  (Leistikow depo., pg. 26, ln. 2–20).  Mr. Leistikow was a plaintiff expert in the Trustmark Litigation.  He was not retained, nor disclosed by the plaintiff as an expert in the present litigation.  He was further not retained, nor disclosed by the defendant as an expert in the present litigation.

In questioning Mr. Leistikow about his report and observations, the following questions and answers appear that are clearly expert testimony:

Q.     And did all of those studs measure to be 20-gauge thickness?

A.     I can look at my field notes to make sure.  Let's see.  What does it say? They ranged from .02 to .035 inches in thickness, which were judged to be basic 20 gauge.

Q.      That would be .032 to .035; correct?

A.      Yes; correct.

Q.      What is the acceptable range - - is there some in manufacturing just natural variation in the thickness of a 20-gauge stud?

A.      Well, it's part of that, and then it's just truing to measure it as far as along the crimped edges and things like that.

Q.      What's the acceptable thickness for a 20-gauge stud? . . .

A.      I can look on Clark or somebody - - there's a reference there that tells you.

Based on one of the references I looked at –there's some others – but like the Clark Steel Framing System, for a 20-gauge which would be 33 mills, the design thickness would have been .0346 inches with a minimum thickness of .0329 inches. (Leistikow depo., pg. 37, ln. 2 – pg 38, ln. 13)

The testimony continues to discuss whether what he observed on site conformed with the range for 20-gauge studs.  Id.  Mr. Leistikow is then asked to describe his observation of the metal studs and to describe the sill track and the condition of both.  He then opines that the "strength of [the studs and sills] had been basically diminished." (Leistikow depo., pg. 39, ln. 11-16).

He then provides scientific testimony describing what happens when a 20 gauge steel stud corrodes including losing the zinc layer, the galvanizing, and then losing the metal (steel).     (Leistikow depo, pg. 40, ln. 4-12).  Leistikow further provides expert opinions based upon hypothetical questions that relate to the structural integrity of the studs and whether there is anything that can be done to protect the structural integrity

assuming that no further water exposure problems occur. (Leistikow depo, pg. 41, ln 6 – pg. 46, ln. 8; pg. 47, ln. 6- pg. 48, ln. 14). He further opines:

Q.     If the corrosion is on the upright u-shaped metal stud, wouldn't that be fully accessible if your wall systems have been removed?

A.     It depends on what other stuff frames into it, whether it's nested.

Q.     Have you ever been involved in a project at all that involved any kind of cleaning and treatment of sacrificial—corrosion of the sacrificial layer of the zinc layer?

A.     No. The typical scope is when you get to this point—just like what you're seeing here. I think your hypothetical thing is a nice hypothetical thing, but it's not real world. I mean the real world is usually you've had moisture ingress for some time[13] and you get corrosion . . . of the base metal. It doesn't –the zinc layer is pretty much there during the construction phase to protect it at that time. But when you get prolonged moisture ingress, like you see here in figure 2, we're talking about two different things. (Leistikow depo, pg. 49, ln. 9- pg. 50, ln. 5).

Mr. Leistikow then provides an opinion that when the corrosion reaches the base metal, you have to make a visual inspection of the severity, the thickness of the metal, and where it's flaking to determine whether the stud can be saved or has to be replaced. He further states that the design at Caribbean I does not even meet the code requirements. (Leistikow depo, pg. 53, ln. 6 – pg. 55, ln. 7).

Mr. Leistikow then goes on to describe his observations and conclusions regarding his inspection of Caribbean I in 2004 including the fact that he observed no bridging between the studs, 20 gauge versus 18 gauge steel studs as called for in the

---

[13] Leistikow expresses his opinion that the building has leaked since the day that the stucco was installed. (Leistikow depo, pg. 253, ln. 1-6).

plans, water sitting in the sill track, and that the fasteners that anchored the sill track to the concrete were corroded.  (Leistikow depo, pg. 56, ln 15 – pg. 57, ln. 19).

Mr. Leistikow next describes deficiencies in the bracing that he observed in the stud wall where there was no continuous bracing.  He further opines that that there should have been continuous bracing of the stud wall from wall to wall.  (Leistikow depo, pg. 59, ln. 23 – pg. 62, ln. 22).  Leistikow then further opines that the 20 gauge studs do not meet the wind load cod requirement for the 88, 93, and the 95 ASCE 7 code.  (Leistikow depo, pg.  65, ln. 14 – pg. 66, ln. 8).

He testified that in his opinion that the anchors that were used to secure the sill track to the concrete should have been different, and that the powder actuated anchors and screws should have been better positioned[14] and more of them used.  That probably a different type of anchor should have been used to provide a higher strength value.  (Leistikow depo, pg.  67, ln. 2-23).

Mr. Leistikow's following questions and answers in his deposition were unquestionably expert opinions:

Q.      Let's now look at your conclusions and recommendations. Paragraph 1, kind of mid paragraph, you state: Since the corrosion of the fasteners and framing cannot be effectively halted—do you see what I'm talking about?

---

[14] Leistikow testified that in his opinion two to four fasteners per foot should have been used. (Leistikow depo, pg.  67, ln. 12 – pg. 68, ln. 11).  He next describes various ways of using different size fasteners and screws to secure the studs to the sill tracks and head tracks as well as what the specs require in fastening the sill and head tracks.  (Leistikow depo, pg.  68, ln. 12 – pg. 73, ln. 4).  He later provides testimony about the different fasteners used for securing different materials and the varying types that were used on the Caribbean I project to secure head and sill tracks and the stud framing and that some of the fastener deficiencies included fasteners missing the studs, fasteners secured too close to the edge, missing fasteners, and not enough fasteners used.  (Leistikow depo, pg. 218, ln. 5 – pg. 226, ln. 19).

A.      I think you've got to go back to the stuff that's above it.  It says:  Due to the thin cross-section of the cold-formed metal stud framing used in the in-fill wall, loss in cross-section caused by corrosion could significantly and rapidly reduce the structural capacity of the framing.   In addition, the corrosion and random installation of the fasteners between the studs and sill tracks and the sill head track and slab are of concern.

So if you combine all that, the corrosion, you combine the fastener pattern, you combine the stud size deficiency, all those things, that's when I come to the conclusion that they need to be removed and replaced.

Q.      When you say they, what do you mean?

A.      Well, the framing needs to be removed and replaced.  (Leistikow depo, pg. 79, ln. 3 pg. 80, ln 3; pg. 199, ln. 13 – pg. 200, ln. 10; pg. 207, ln. 7- 19).[15]

Leistikow also expresses an opinion that there was water intrusion prior to Hurricane Ivan and that the metal studs had experienced corrosion prior to Hurricane Ivan.  He further relies upon the testimony from Williamson[16] to support his opinion that some of the corrosion existed prior to Hurricane Ivan. (Leistikow depo, pg.  100, ln. 4 – pg. 104, ln. 15; pg. 122, ln. 7 – pg. 126, ln. 23; pg. 139, ln. 7 – pg. 140, ln. 6).[17]

---

[15] Leistikow testified that he was not asked to determine what problems were related to construction defects as opposed to hurricane damage.  (Leistikow depo, pg.  92, ln. 11-23).

[16] The reference to Williamson is the Williamson & Associates report authored by Vincent Smith, another "expert" witness who was not disclosed by defendants and whose testimony is likewise sought to be introduced by reading his deposition from the Trustmark litigation.

[17] Leistikow's expert opinions continue throughout his deposition in the Trustmark litigation to include, among other things, that:  the deficiencies in the exterior façade contributed to the post-hurricane moisture intrusion and deterioration of the cold-formed metal framing (Leistikow depo, pg.  148, ln. 12 – pg. 149, ln. 8); the studs had already been compromised from corrosion prior to the hurricane (Leistikow depo, pg.  150, ln. 14 – pg. 151, ln. 3); that in April 2004, when he inspected the Caribbean units 101 and 604

He testifies that, based upon his "education and training", that he would expect that if the wall was constructed properly and insulated properly and waterproofed properly, you wouldn't see the corrosion problem that he observed even though the dew point would have been likely found to be in the cavity of the wall between the interior low humidity and exterior high humidity. (Leistikow depo, pg. 110, ln. 10 – pg. 114, ln. 5).

### Jeremy Gildenmeister (Trustmark Litigation)

Mr. Gildenmeister's testimony is replete with opinions based upon his special knowledge, training or skill concerning the cause of certain damage, defects and other issues. Such testimony is clearly expert testimony under FRE 702 such that he should have been disclosed as an expert witness by the defendant. Such testimony includes:

Q.      And did you observe any debris damage to the side of the building?

---

and observed corrosion in the stud wall of those units, that there was also similar, although unobserved, corrosion going on in the other units (Leistikow depo, pg. 153, ln. 18 – pg. 154, ln. 22); that the anchoring system for the wall units did not meet the code that applied at the time of construction, including safety factors, wind loads, calculation of deflection criteria for interior zone window studs, that the studs were defective due to deficient web crippling and in moment strength, and that he did not observe any evidence of web crippling or moment strength failure. (Leistikow depo, pg. 156, ln. 16 – pg. 188, ln. 16). He continues to render opinions concerning deflection, L-over-360 values and L-over 240 values for deflection, web crippling and moment capacity—all of which are beyond the ken of the ordinary juror. (Leistikow depo, pg. 188, ln. 22 –pg. 197, ln. 23). He opines that there was a "failure of the wall system" as evidenced by the leaking. (Leistikow depo, pg. 236, ln. 9-15); that the stucco system could have cracked due to deficient installation or design rather than any flexion in the wall system (Leistikow depo, pg. 245, ln. 23 – 247, ln. 9); and that there was more evidence of corrosion in the lower levels than upper levels of the condominium due to water from upper floors running down the building. (Leistikow depo, pg. 245, ln. 23 – pg. 249, ln. 5). He then provides expert opinions regarding the windows and sliding glass doors and their installation and how such installation could affect the water intrusion issues experienced at the condominium. (Leistikow depo, pg. 266, ln. 8 – pg. 274, ln. 13; pg. 276, ln. 3 - pg. 283, ln. 12).

A.      If I recall correctly, the only damage that I saw that pertained to wind damage was to the rear parapet wall on the south—no the north side of the building, the parapet wall on the north side of the building, but it was the south portion of the wall there was a hole there.   (Exhibit D (hereinafter "Gildenmeister depo.") Gildenmeister depo., pg. 13, ln. 25 – pg. 14, ln. 6).

. . .

Q.      I mean was there more mold growth?  Was there—I mean—

A.      No. As far as I was concerned, a lot of the drywall that was taken down was taken down unnecessarily.

Q.      Why do you say that?

A.      Well, just based on the first inspection and the second inspection that I had on the property.  It didn't appear—I mean, there was damage cause by the hurricane, but not as quite severe as what was presented.  (Gildenmeister depo., pg. 25, ln. 12-20).

. . .

Q.      Did Hague conclude that there were any problems with the building prior to the hurricane?

. . .

A.      Um. Yeah, you know, they made a comment that the stucco wasn't properly installed.[18]

---

[18] Gildenmeister's testimony is replete with hearsay testimony where he testifies to the conclusions of other witnesses (experts themselves) and the reports of others who either inspected the building or performed some test upon the building.  Such testimony should be excluded as hearsay under FRE 802 and/or FRE 805 as hearsay within hearsay. The hearsay testimony is underlined above regarding Gildenmeister.

Q.      Without getting into all the details in the report, is it generally your understanding that they took issue with the installation of the control joints in the stucco system?

A.      Yes.  (Gildenmeister depo., pg. 27, ln. 8-21)

. . .

Q.      Okay.  What was the conclusion that Hague reached concerning the flashing and sealants around the windows?

A.      They stated that it's their opinion that the condition was further exasperated by improper flashing and sealing around openings in the wall. (Gildenmeister depo., pg. 30, ln. 13-17).

. . .

Q.      Did you observe any further rusting or deterioration of the steel studs that was visibly—

A.      Yes.

Q.      --worse than it—

A.      Yes.

Q.      Was it visibly worse than your earlier inspection?

A.      Yes.

Q.      Anything else where the condition of the building had looked worse than it did during your prior inspection?

A.      Well, there was, you know, we still noted that there was water in the metal stud walls and in the pans.  (Gildenmeister depo., pg. 41, ln. 14-25).

. . .

Q.     And how did you – How did it come about that you learned about the construction litigation?

A.     Just in conversation regarding the excessive damages and lack of debris that would cause that excessive damages on the units.  (Gildenmeister depo., pg. 84, ln. 11-15).

. . .

Q.     And if the damage isn't repaired at the time of loss, might it cost more to repair it later?

A.     Yes.

Q.     And why is that?

A.     Because if the repairs are not completed, it could spread to other areas of the units.

Q.     I mean, for instance, if somebody has a home and they have a hole in their roof, and they leave that hole open for several months, they might end up with drywall collapsing in their bedrooms and furniture getting we and carpet and all that; right?

A.     Yes.

**Dorothy Diane King (Trustmark Litigation)**

It is clear that the defendant is attempting to admit expert testimony from a non-expert in violation of FRE 702 with the following testimony from Dorothy King.

Q.     Have you made a determination—I'm talking about your personal opinion about what the cause of the problems of the building is.

A.     Well, it seems to me that it either has to be poor construction, poor materials, poor supervision, any or all of those.  <u>And I don't know, of course.  The</u>

experts supposedly know.   (Exhibit E (hereinafter "King depo.") King depo., pg. 13, ln. 19 – pg. 14, ln. 2)(emphasis added).

The very next question and answer puts Mrs. King's knowledge on the issues into some perspective:

Q.      . . . You haven't gone out there and done an investigation and attempted to pinpoint the source of the waster intrusion?

A.      No. (Dorothy King depo., pg. 14, ln. 3-7.

Mrs. King has a master's degree in biology.  She is licensed to teach English, biology, science, and health occupations.  She is a licensed registered respiratory therapist.  (Dorothy King depo., pg. 17, ln. 12-21).  She had just been asked in her deposition whether she possesses any experience or history in evaluating the cost of property.  Mrs. King replied that she did not.  She has no scientific, technical or other specialized knowledge that will assist the trier of fact in determining a fact in issue, nor is she qualified by knowledge, skill, experience, training, or education such that she could qualify as an expert to render an opinion as to the cause of any water intrusion, quality of construction techniques, materials or supervision of the construction process.  The defendants are attempting to admit expert testimony from a lay witness who is not qualified by any stretch under Rule 702, nor is the testimony "rationally based upon the perception of the witness" so as to qualify it as permissible opinion testimony from a lay witness under Rule 701.  There is no testimony that Mrs. King was ever present during the construction process so that she could observe the materials being used in constructing the condominium, the processes used in construction, or the supervision of the employees, contractors, or subcontractors responsible for the many different phases of

construction.  It is clear that her opinions are not based upon her perception, but are merely conclusions based upon speculation as to the cause of certain problems in the condominium.  See Grady v. Bellsouth, 160 Fed. Apppx. 863 (11th Cir. 2005)(witness testimony excluded under Rule 701 where opinion was not based upon her perceptions and was at most speculative and conclusory).

### Kelly Lee Murphy (Trustmark Litigation)

The defendant has designated a small portion of the deposition testimony of Kelly Lee Murphy taken in the Trustmark litigation that it intends to read to the jury in the present case.  The following question and answer is objectionable on several grounds:

Q.     And what is your understanding about the cause of those problems?

A.     That there was something wrong with the building. (Exhibit F, Murphy depo., pg. 9, ln. 15-18).

Kelly Murphy's "understanding" of the cause of any problems is irrelevant.  See Agee v. White, 809 F.2d 1487, 1494 (11th Cir. 1987(defendant's subjective "understanding" of statement irrelevant to determination of coercion); Kobryn v. McGee, 503 S.E.2d 630 (Ga. App. 1998)(plaintiff's "understanding" irrelevant where there is no apparent basis for it).   Relevance is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."   FRE 401.   The testimony lacks any foundation whatsoever for Mrs. Murphy's "understanding" and thus is inadmissible because there is no evidence to support the conclusion that the evidence is based upon her personal knowledge of the matter.  See FRE 602.

In addition, the question and answer clearly attempt to admit testimony that should be provided by an expert witness.  The cause of problems with the building in question are not within the ordinary person or juror's knowledge.  To say that there was something "wrong with the building" is not helpful to the trier of fact.  The jury can reach the same inference or conclusion on their own without the testimony of the witness, therefore, her lay opinion is not helpful to the trier of fact.  See Portis v. Wal-Mart Stores East, L.P., 2008 WL 2959879 (S.D. Ala. 2008)(witness' testimony that items were "safely stackable" excluded where jury would be able to draw their own conclusions and there was no reason to believe that witness possessed any experience or particular insights on subject).

III.     **Defendants May Not Admit Undisclosed Expert Testimony by Masking the Testimony as Lay Opinion Testimony Under Rule 701**

Rule 701 addresses lay witness opinion testimony and requires that such testimony, among other things, be (1) "rationally based on the perception of the witness" (2) "helpful to a clear understanding of the witness' testimony of the determination of a fact in issue" and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Id.   The Advisory Committee Notes to Rule 701 state that the Rule was amended in 2000 "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Id.  The "within the scope of Rule 702" language was designed to "protect against evasion of the Rule 702 reliability requirements, without requiring parties to qualify as experts those witnesses who traditionally and properly have been considered as providing lay witness testimony." Tampa Bay Shipbuilding & Repair Co.

v. Cedar Shipping Co., Ltd., 320 F.3d 1213, 1223 (11th Cir. 2003).  "The  amendment was not intended to affect the "prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences."  Id. at 1223 (quoting FED.R.EVID. 701 Advisory Committee's Note, quoting in turn Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1196 (3d Cir. 1995)).  Opinions describing or ascribing damage due to design or construction defects are clearly not the "prototypical examples" of opinions that are contemplated by Rule 701 and that have traditionally been admitted as lay opinion testimony.  See U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc., 296 F. Supp.2d (S.Dist. Ala. 2003)(testimony of force required to crumple an exhaust duct on a jet engine is clearly of a different tenor than those "prototypical" examples of Rule 701 testimony");  Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Intern., Inc., 533 F.3d 555, 561 (7th Cir. 2008)("Testimony based solely on a person's special training or experience is properly classified as expert testimony, and therefore it is not admissible under Rule 701").[19]

---

[19] Alabama courts have consistently held that expert testimony is required when a product or issue is complex and technical in nature and beyond the ken of the average juror.  See Sears, Roebuck & Co. v. Haven Hills Farm, Inc., 395 So.2d 991, 995 (Ala. 1981)(AEMLD cases require expert testimony due to complex and technical nature of commodity);  Watson, Watson, Rutland/Architects, Inc. v. Montgomery County Bd. of Educ., 559 So.2d 168, 173 (Ala. 1990)(expert testimony needed in case against architect, just as in cases in dealing with attorney, doctor or any other professional in order to establish breach of duty).

To the extent that defendant may argue that the testimony of Gildenmeister, Leistikow or Smith[20] are lay opinions permissible under FRE 701, it is clear that they present precisely the type of testimony "based on scientific, technical, or other specialized knowledge <u>within the scope of Rule 702"</u> that makes FRE 701 inapplicable. Leistikow is an engineer who speaks in terms of web crippling, moment strength, wind deflection, and corrosion of the sacrificial layer of zinc. His is quintessentially an FRE 702 expert witness whose testimony is based upon the type of scientific, technical or other specialized knowledge excluded by FRE 701.

Similarly, Gildenmeister provides testimony concerning his observations based upon his experience, skill and specialized knowledge as a claims adjuster that enable him to opine that certain corrosion that he observed was caused by the intrusion of water at a given point in time or that damage was or was not caused by Hurricane Ivan. Such testimony is also clearly FRE 702 testimony excluded by FRE 701.

## <u>CONCLUSION</u>

Based upon the foregoing, the former testimony offered by the defendant from the Trustmark litigation should be excluded under FRE 802 as hearsay, based upon the defendant's failure to meet its burden in showing that the witnesses are unavailable and that the plaintiff had a similar motive to cross-examine the witnesses in the previous case.

Further the testimony of Jeremy Gildenmeister, Vincent Smith, and Leistikow should also be    excluded under Rule 37(c)(1) based upon the defendant's failure to designate the witnesses as experts pursuant to Rule 26(a)(2) and the court's pretrial order.

---

[20] Although Smith is included herein for purposes of excluding his former testimony, plaintiff has determined that Smith's opinions cannot withstand the requirements of FRE 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.,</u> 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Respectfully submitted,

s/ E. J. Saad
E. J. Saad (SAADE8614)
Attorney for Plaintiff

s/ Keith B. Franklin
Keith B. Franklin (FRANK8196)
Attorney for Plaintiff

s/ Matthew Andrews
Matthew Andrews (ANDRM1672)
Attorney for Plaintiff

OF COUNSEL:

THE ATCHISON FIRM, PC
6207 Cottage Hill Road, Suite G
Mobile, Alabama   36609
251-660-0888 (Telephone)
251-660-0777 (Fax)
ejsaad@crosbysaad.com
keith.franklin@atchisonlaw.com
mandrews@crosbysaad.com

**CERTIFICATE OF SERVICE**

      I do hereby certify that on this  20th day of February, 2009, I have served a copy of the foregoing upon all counsel of record listed below via United States Mail, properly addressed, first class postage prepaid, or via electronic filing with the above Court:

Archibald T. Reeves, IV, Esq.
McDOWELL, KNIGHT, ROEDDER & SLEDGE, LLC
63 South Royal Street, Suite 900
Mobile, AL  36602
(251) 432-5300
(251) 432-5303 (Fax)
E-mail: areeves@mcdowellknight.com
Attorneys for Great American
Insurance Company of New York

                    s/ E. J. Saad_____
                    E. J. Saad